**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| LDR INDUSTRIES, LLC, | Case No. 14-32138 |
| Debtor. | Honorable Pamela S. Hollis |

**DECLARATION OF WILLIAM UNDERWOOD IN SUPPORT OF CHAPTER 11
PETITION AND FIRST-DAY MOTIONS**

I, William Underwood, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby certify that the following is true and correct to the best of my knowledge, information and belief (the "Declaration"):

1.      I am the President and Chief Executive Officer of LDR Industries, LLC, ("LDR"). LDR is a limited liability company organized and existing under the laws of the State of Illinois. LDR's principal place of business and principal office is located at 600 North Kilbourn Avenue, Chicago, Illinois. On September 2, 2014 (the "Petition Date"), LDR filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the "Chapter 11 Case").

2.      I have served as President and Chief Executive Officer of LDR since April 1, 2013. The managers of LDR are Larry Greenspon and Dennis Greenspon. The sole member of LDR is GB Holding, Inc., which is owned by Larry Greenspon and Dennis Greenspon. The filing of the Chapter 11 Case was duly authorized by the managers of LDR.

3.      In my capacity as President and Chief Executive Officer, I am very familiar with LDR's day-to-day operations, business affairs, and books and records. I work closely with a

core management team that has an average of over 28 years of experience in the industry.  That

team includes David Pollans, Loren Greenspon, and me.

4.      I am familiar with LDR's existing secured indebtedness, the proposed use of cash

collateral and the proposed debtor–in–possession financing facility, LDR's cash management

systems and employee wages, healthcare and other benefits, all of which are the subjects of

various "first day motions" filed in this Chapter 11 Case by LDR (collectively, the "First-Day

Motions," and individually, a "First-Day Motion").  As a result of my familiarity with these

matters, as well as my personal experience with LDR and in the wholesale hardware industry, I

have formed opinions regarding the necessity for the relief sought in the First-Day Motions,

especially to the extent that such relief will enable LDR to continue to operate in the ordinary

course of its business as it pursues a sale of substantially all of its assets.

5.      I submit this Declaration in support of the First-Day Motions described below, as

well as other motions and applications that LDR expects to file in the first several weeks of the

Chapter 11 Case.  Except as otherwise indicated, all statements set forth in this Declaration are

based upon my personal knowledge, my review of the relevant documents and records, and/or

my opinion based upon my experience and knowledge of LDR's operations and financial

condition.  If I am called upon to testify, I can and will testify to the facts and matters set forth

herein.  Any capitalized terms not expressly defined herein shall have the meaning ascribed to

that term in the relevant First-Day Motion.

6.      Based on my personal knowledge and the review discussed above, I believe that

the relief sought by LDR in the First-Day Motions is necessary to enable its bankruptcy estate to

be administered effectively and to give LDR its best chance to sell its business as a going

concern and maximize the recovery by its creditors.  Failure to grant such relief would have a

serious negative impact on LDR's efforts to continue operating during its Chapter 11 Case pending a sale of its assets. For example, LDR must utilize cash collateral and obtain additional debtor in possession financing to purchase new goods, market and distribute them, collect receivables and otherwise operate its business in the ordinary course. The inability to utilize cash collateral and to obtain additional financing in order to pay ordinary course business expenses will result in substantial and irreparable harm to the going concern value of LDR and would otherwise not be in the best interests of this estate and its creditors.

7.      Part I of this Declaration describes the business of LDR, its debt structure and the circumstances surrounding the filing of this Chapter 11 Case. Part II sets forth the relevant facts in support of LDR's First-Day Motions, and the documents filed concurrently therewith. Part III addresses the status of a proposed sale of LDR's operating assets. Part IV provides information with respect to LDR's applications seeking to employ certain professionals on its behalf.

## I.      BACKGROUND

**A.      Nature of the Business.**

8.      LDR Industries, Inc. ("LDR") is an importer, distributor and wholesaler of plumbing fixtures and supplies. LDR buys products from both foreign and U.S. companies and distributes to retail stores such as Home Depot and Sears.

9.      LDR's principal offices have been located in Chicago, Illinois, since its formation in 1988. LDR leases its principal offices from 600 N. Kilbourn, L.L.C., which is owned by Dennis Greenspon and Larry Greenspon.

10.      For most of its existence, LDR has been a profitable company. Although sales volume has softened in recent years, with annual net sales falling from $73.6 million in 2010 to $65 million in 2013, the company has maintained its operating margins at a consistent level.

11.     LDR has a wholly-owned subsidiary, LDR International, Inc., that is based in Taiwan.  LDR International, Inc. is a sourcing office for LDR and primarily performs quality control, packaging and assembly functions.   It also engages in a small amount of light manufacturing in Taiwan.

12.     LDR has another wholly-owned subsidiary, Starlion International Co., Ltd. ("Starlion"), which is a holding company for SLK Hardware Co., Ltd.  SLK Hardware Co, Ltd. is a Beijing-based exporter of certain plumbing fixtures and supplies and is a significant supplier to LDR.

13.     Neither LDR International, Inc. nor Starlion has filed a petition for relief under the Bankruptcy Code, and both entities continue to operate its business in the ordinary course.

**B.      Employees.**

14.     LDR employs approximately 90 people (collectively, the "Employees"), of whom 89 are full-time, and one is part-time.   Thirty-nine Employees—primarily management and administrative—are salaried, with 51 Employees paid on an hourly basis.   Nearly all of the Employees work at LDR's Chicago location.

15.     LDR is not a party to a collective bargaining agreement.  LDR's key employees have an average tenure of approximately 20 years with a low turnover rate.   LDR does not typically pay Employees bonuses, and no Employees earn commissions.

16.     LDR provides Employees with benefits packages that include paid time off, health and dental insurance, long-term disability insurance, group life insurance, and a 401(k) program.

**C.      Financial Condition of the Business and Value of the Assets.**

17.    In the last several years, LDR generated annual net sales of approximately $65 million.  In the seven months ended July 31, 2014, LDR had revenues of approximately $35.7 million.

18.    As of the Petition Date, LDR's books and records reflected accounts receivable of approximately $10 million, net of accruals for customer rebates and advertising credits and net of allowance for doubtful accounts (the "Outstanding Accounts Receivable").  Due to the quality of its customers as well as strong management and collection efforts, LDR has had minimal bad debt write-offs in recent years.  None of the accounts receivable are subject to offsets or other contras.  Accordingly, based on historical collection experience, LDR is likely to collect a very high percentage of the Outstanding Accounts Receivable as long as it continues to operate in the ordinary course of business.

19.    As of the Petition Date, LDR owns approximately $13.5 million of inventory at cost.  LDR expects to generate gross revenue of approximately $23.5 million from the sale of its pre-petition inventory (including the obsolete or not saleable inventory discussed below) through the normal operation of its business.

20.    Approximately $1.4 million of LDR's inventory is obsolete, slow-moving or otherwise not saleable in the ordinary course of business, such as packaging material.

21.    If LDR's inventory had to be liquidated or sold outside of the ordinary course of business, I believe the net proceeds would be substantially less than $7 million.

22.    As of the Petition Date, LDR had equipment and other fixed assets with an aggregate net book value of approximately $100,495, after accumulated depreciation.

**D.    Financing and Other Indebtedness Prior to the Chapter 11 Case.**

(1).    Secured Indebtedness of JPMC.

23.    LDR relies on bank financing for its working capital and maintains a revolving line of credit and other credit relationships with JPMorgan Chase Bank, N.A. ("JPMC").  The outstanding obligations to JPMC are secured by a senior lien upon substantially all of LDR's assets.

24.    On or about June 26, 2013, LDR and its affiliates entered into a Credit Agreement with JPMC (the "Prepetition Indebtedness").  This Credit Agreement provides for a revolving line of credit facility of up to $20 million, subject to a borrowing base.  It also includes a term loan in the amount of $2,600,000 in connection with the building occupied by the Debtor.  Letters of credit issued to secure surety bonds required by Customs are part of the revolving line of credit facility.

25.    The other parties to the Credit Agreement are 600 N. Kilbourn, L.L.C., which mortgaged its real estate to secure the Prepetition Indebtedness, and affiliates GB Holdings, Inc. and LDR International, Inc., which have guaranteed the obligations to JPMC.  600 N. Kilbourn, L.L.C., GB Holdings, Inc., and LDR International, Inc. have granted security interests in their respective assets to secure the Prepetition Indebtedness.  There is also a separate pledge agreement granting JPMC a security interest in the membership interests of 600 N. Kilbourn, L.L.C. to secure the Prepetition Indebtedness.  The proceeds from the Prepetition Indebtedness were used to repay a secured prior loan from JPMC having a similar structure.

26.    Accrued interest on each loan is payable in arrears.  The maturity date of the Prepetition Indebtedness is June 24, 2016, and it may be prepaid before then.

27.    Before the Petition Date and pursuant to the term of the Credit Agreement, all of LDR's account debtors paid into a lockbox, which JPMC swept daily into a Collection Account.

JPMC applied the amounts in the Collection Account to reduce the revolving loan on a daily basis.

28.     The security interests that LDR granted to JPMC to secure the Prepetition Indebtedness (the "Prepetition Security Interests") cover substantially all of LDR's assets and property (the "Prepetition Collateral"), which include "cash collateral" as I understand such term is defined in Section 363(a) of the Code (the "Cash Collateral").

29.     I am unaware of, and the results of a recent UCC search confirm, that no creditors other than JPMC hold a security interest in any of the Debtor's assets as of the Petition Date.

30.     As of the Petition Date, the total outstanding amount owed to JPMC under the Prepetition Indebtedness is approximately $18.5 million.

(2).     <u>Unsecured Indebtedness.</u>

31.     LDR currently has approximately 105 trade and other creditors with general unsecured claims totaling approximately $2,265,000.  This total is subject to the resolution of any claims relating to leases and executory contracts.  In addition to these trade and other general unsecured claims, U.S. Customs and Border Protection asserts a claim in the amount of approximately $4.5 million which is disputed by LDR.  If that claim is allowed, it may be entitled to priority treatment under the applicable provisions of the Bankruptcy Code.

(3).     <u>Executory Contracts and Unexpired Leases</u>

32.     As noted above, LDR leases its principal offices from its affiliate, 600 Kilbourn, L.L.C., and this lease expires March 31, 2024.  LDR is also a party to other unexpired equipment leases for forklifts and other warehouse equipment.  LDR is subject to various executory contracts, including those with Thrive Technologies, a third party software company, and Commonwealth Supply Company for remodeling LDR's warehouse space.

**E.      Events Leading to Filing for Relief under Chapter 11 of the Bankruptcy Code.**

33.      LDR filed its chapter 11 petition as a result of a serious dispute with U.S. Customs and Border Protection ("Customs") that it has been unable to resolve.  This dispute arose from duties assessed on one of LDR's principal imported products, cut steel pipe from China.  The Port of Chicago Customs office has asserted that this pipe is subject to antidumping duties ("ADD") and countervailing duties ("CVD").  Customs originally issued bills to LDR for about $6.7 million in ADD/CVD going back to shipments made in 2011 and 2012.

34.      LDR believes that the imported pipe was not subject to ADD/CVD because the pipe does not fall under the scope of the ADD/CVD orders on the pipe in question.  LDR pursued administrative procedures to contest the $6.7 million claim by filing protests with Customs regarding the bills for ADD/CVD.  Based on information that LDR provided, Customs reduced the bills to about $4.5 million.

35.      LDR's opportunities to further challenge the Customs' ADD/CVD assessment would ordinarily include filing an action in the U.S. Court of International Trade.  However, a jurisdictional requirement for initiating such an action is prior payment in full to Customs of the amounts in question and then filing suit to contest the charge and seek a refund, which I understand is set forth at 28 U.S.C. § 2637(a).  LDR was unable to follow this procedure because it lacked the necessary funds to fully pay the duties in order to invoke the jurisdiction of the U.S. Court of International Trade.

36.      LDR attempted to resolve the duties issues through an offer in compromise.  Representatives of LDR met with Customs in Chicago in April 2014 to discuss a potential settlement offer.  During the meeting, LDR asked Customs to withhold taking any action on the protests or any other enforcement action until LDR could finalize and submit its offer, which it

committed to do by June 13, 2014.  LDR made an offer to Customs which would have resulted in it receiving the full ADD/CVD amount asserted of approximately $4.5 million.  In addition to making Customs whole for the ADD/CVD it had claimed, this proposal would have allowed LDR to remain a viable company and protected the livelihoods of its employees.

37.     Before LDR could submit its settlement offer, the Chicago Customs office, without any notice or warning, issued formal denials of LDR's protests.  These denials had important legal and financial consequences for LDR and precluded LDR from submitting its intended settlement offer.

**F.     The Filing of the Chapter 11 Case.**

38.     LDR filed its chapter 11 petition on September 2, 2014 in order to prevent any further enforcement action by Customs and to preserve the going concern value of its business. LDR is negotiating a sale of its business to a strategic buyer, and it anticipates filing a motion with the Bankruptcy Court in the near future to approve such a sale pursuant to Section 363 of the Bankruptcy Code.  LDR expects that the sale of substantially all of its assets will not only fully satisfy its secured creditor, JPMC, but will leave its estate with a substantial amount of funds to distribute to its unsecured creditors.  Following the Petition Date, LDR continues to operate its business and manage its affairs as a debtor in pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

39.     LDR has been discussing a sale of its operating assets to other significant companies in its industry in order to maximize the recovery by LDR's creditors.  LDR expects to negotiate an asset purchase agreement and then file a motion to approve a sale pursuant to Section 363 of the Bankruptcy Code.  In order to enable LDR to operate effectively and to avoid the adverse effects that the Chapter 11 Case might otherwise have on its business while it

undertakes the sale process, LDR has requested various types of relief in the First-Day Motions

filed with this Court.

## II.      FIRST-DAY MOTIONS

40.      A critical element in LDR's attempt to maximize the benefit to its creditors and to

realize the highest and best price for the sale of its assets is approval of each of LDR's First-Day

Motions.  In furtherance of these objectives, LDR respectfully requests that "first-day" orders of

the types described below be entered.  Factual information in support of such first-day orders is

provided below and in the First-Day Motions themselves.

### A.      Cash Collateral and Debtor in Possession Financing.

41.      I understand and believe that the description of the financing arrangements and

current indebtedness to JPMC discussed herein and in the relevant motion is accurate.

42.      As of the Filing Date, (a) the amount due to JPMC on the Prepetition Revolving

Line of Credit is $14,816,801325, consisting of $14,785,410.89 in principal and $31,390.36 in

accrued interest and other fees and charges (the "Prepetition Revolver Debt"), (b) the amount

due to JPMC on the Term Loan is $2,636,666.62, consisting of $2,636,666.62 in principal and $0

in accrued interest (the "Prepetition Term Debt"); and (c) the face amount of the letters of credit

issued and outstanding under the Letter of Credit Facility is $1,540,000.

43.      JPMC's Prepetition Security Interests cover LDR's assets and property, which

would include any "cash collateral" as that term is defined in Section 363(a) of the Code.

44.      LDR continues to serve its customers, but LDR's operations would be severely

disrupted if its use of Cash Collateral were to be abruptly discontinued.  In that event, it would be

unable to pay operating expenses and unable to operate its business in an orderly manner,

thereby severely impairing its ability to operate as a going concern, collect its accounts receivable, market and sell its inventory and maximize the value of its other assets in a sale.

45.     In addition, the operation of LDR's business routinely experiences timing lags between its needs for cash to make payroll and to pay other ordinary expenses in a timely fashion and the collection of accounts receivable.  To provide LDR with a cushion to absorb such short term cash needs, LDR has negotiated with JPMC to obtain a Debtor in Possession Loan ("DIP Loan") of up to $2 million that it will be able to draw upon to meet short term cash needs.  Of that amount, the Debtor requires the use of up to $1,250,000 over the next two weeks to meet short term cash needs which it will then pay down as it collects more accounts receivable in the weeks thereafter.

46.     The DIP Loan will be secured by the same collateral that currently secures the pre-petition bank loan and will be subject to availability based on a borrowing base.

47.     The Debtor's use of Cash Collateral alone is insufficient to meet the Debtor's post-petition liquidity needs.  The Debtor has an immediate and critical need to obtain post-petition financing under the DIP Loan and to use Cash Collateral in order to finance the ordinary costs of its operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs.

48.     The Debtor's access to sufficient working capital and liquidity through the incurrence of post-petition financing pursuant to the DIP Loan on an interim basis and under the terms of the proposed order is vital to the preservation and maintenance of the going concern value of the Debtor's estate.  Consequently, without access to $1,250,000 of additional borrowing authority under the DIP Loan, to the extent authorized pursuant to the court's interim order authorizing such borrowing, the Debtor would suffer immediate and irreparable harm.

49. The Debtor is unable to obtain adequate unsecured credit under Section 503(b) of the Bankruptcy Code or secured credit under Section 364 of the Bankruptcy Code from sources other than the Lender on terms more favorable than the terms of the DIP Facility. The only feasible source of secured credit available to the Debtor is the DIP Loan. The Debtor requires financing under the DIP Loan under the terms of the proposed interim order in order to satisfy its immediate critical post-petition liquidity needs.

50. I believe that LDR and its estate will suffer immediate and irreparable harm unless LDR is immediately authorized to use Cash Collateral and to borrow necessary additional amounts under the DIP Loan on an interim basis pursuant to the terms and conditions set forth in the proposed Financing Order.

51. Respective business representatives and counsel for JPMC and LDR conducted lengthy, good faith negotiations with respect to the terms and conditions of the Financing Order and the interim budget attached thereto (the "Budget"). The provisions of the Financing Order have been negotiated at arms' length and in good faith. In addition, I believe the provisions of the Financing Order are fair and reasonable under the circumstances and in the best interests of creditors.

**B.     Cash Management.**

52. LDR currently maintains a cash management and disbursement system in the ordinary course of its operations (the "Cash Management System"). The Cash Management System utilizes bank accounts (the "Bank Accounts") at JP Morgan Chase Bank ("JPMC"), a federally-insured banking institution. LDR's cash management system is managed by responsible individuals under my direction at its Chicago offices. I believe that the description of the movement of funds through LDR's cash management system as set forth herein and in the

relevant motion is accurate.  A description of the Bank Accounts is listed on "Exhibit A" to the motion requesting authorization for the continued use of LDR's Cash Management System.

53.    Through utilization of the Cash Management System, LDR is able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect collection, disbursement, and movement of cash.

54.    LDR has employed the Cash Management System for several years, and the Cash Management System constitutes its ordinary business practice.

55.    I believe that the Bank Accounts constitute an integral component of LDR's operations, and that LDR should seek a waiver of the United States Trustee's requirement that such accounts be closed and that new postpetition bank accounts be opened.  If enforced, I believe the requirement will unnecessarily disrupt LDR's ability to maximize the value of its estate.  If such relief is not granted, LDR will suffer significant harm resulting from the termination of the present system and the inherent delay in establishing postpetition systems and procedures governing the use and application of its funds.  In addition, because of LDR's integrated financial structure, it would not be possible to establish a new system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the bankruptcy estate.

56.    I believe that maintaining LDR's existing Cash Management System will not only lessen the disruption caused by the bankruptcy filing during the relatively brief period while it seeks to market and sell its business as a going concern, but it will also reduce the expenditures of resources associated with the changes required by an immediate transfer of LDR's existing banking and changes in its cash management systems.

57.     To protect against inadvertent payment of prepetition claims, LDR's personnel and the personnel at JPMC with whom LDR customarily deals will be instructed how to readily distinguish between prepetition and postpetition obligations without closing existing accounts and opening new ones.   To ease the task of distinguishing between prepetition date and postpetition date checks, LDR intends to: (i) leave a "gap" in its check numbers such that check numbers preceding the gap will be readily identifiable as prepetition checks and the check numbers following the gap will be readily identifiable as postpetition checks; or (ii) otherwise utilize its existing software to implement a monitoring system which has the same effect.

58.     Due to the nature and scope of LDR's business and the numerous suppliers of goods and services and others with whom it transacts business, LDR must also seek authority to continue its use of existing business forms, correspondence and checks without alteration or change.   Changing correspondence and business forms would be unnecessary, would be burdensome to LDR's estate, would result in undue expense and would be disruptive to its ongoing business operations.

59.     If LDR is not permitted to continue to use its existing business forms, the resulting prejudice will include significant delay in the administration of LDR's business operations and the imposition of an unnecessary cost to LDR's estate to print new business forms.

60.     Similarly, LDR must seek authority to continue to use its existing books and records to minimize expense to the estate.   I believe that opening new books and records would be burdensome to the estate and disruptive to LDR's business operations.   LDR has fully-functioning systems that thoroughly and accurately account for all cash and other transactions

and track LDR's financial performance.  Changing the current system would be costly and would greatly increase the potential for error.

61.    Moreover, because LDR's Cash Management System and existing Bank Accounts are tied to LDR's use of cash collateral, and because LDR will suffer immediate and irreparable harm if it is not authorized to use cash collateral and to borrow necessary additional amounts under the proposed debtor-in-possession loan on an interim basis, LDR and its estate will suffer immediate and irreparable harm unless LDR is immediately authorized to continue the use of its Cash Management System and existing Bank Accounts.

**C.    Prepetition Wages, Benefits and Insurance Coverage**

62.    I understand and believe that the description of the prepetition wage claims, benefits and related employee obligations discussed herein and further set forth in detail in the relevant motion is accurate.

63.    LDR's Employees are paid bi-weekly for the two week period ending one week prior to pay day.

64.    LDR's third-party servicer, Howard Simon & Associates, Inc. ("HS&A"), processes LDR's payroll and provides LDR a mechanism for paying employee wages and benefits, and calculating all proper employer and employee withholdings from the payroll, including all payroll taxes (collectively, the "Payroll").

65.    LDR's Payroll is processed as follows:  in the week period between the end of the pay period and pay day, HS&A processes the LDR's Payroll for the prior period and makes arrangements for direct deposit for certain Employees, and prints paychecks for other Employees.  LDR wires the appropriate amount to HS&A from LDR's payroll account (the "Payroll Account") and HS&A issues checks and makes direct deposits directly to Employees

from HS&A's own account.  HS&A is also authorized to write checks on the Payroll Account directly to Employees, if necessary or if requested by LDR.  Checks and direct deposits are distributed to Employees on the Friday following the end of the pay period.

66.     The last pay period prior to the Petition Date ended on August 29, 2014.  Prior to the Petition Date, LDR wired the funds to HS&A necessary to pay all Employees, and LDR anticipates that HS&A will distribute checks and make direct deposits from its account to all Employees, on Friday, September 5, 2014, as scheduled.

67.     LDR's next pay period will end September 12, 2014, and will include pre-petition time from August 30, 2014 to the Petition Date.  In total, the amount due and owing to Employees for pre-petition wage claims is approximately $38,416.45.  No Employee is owed in excess of $12,475 for pre-petition wages.

68.     In addition to salary and wages, LDR has provided its Employees other forms of compensation, including paid time off ("PTO") and paid holidays.  Specifically, Employees are eligible for up to two weeks paid vacation and six sick days each year depending on length of service.  PTO is awarded to each Employee on January 1st of each year, to be used by each Employee as needed.  PTO does not carry over from year to year.  Full-time Employees are also entitled to eight assigned holidays (New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Friday following Thanksgiving, Christmas Eve, and Christmas Day).

69.     Further, prior to the Petition Date and in the ordinary course of its business, LDR had a policy of reimbursing its Employees for reasonable and identifiable legitimate business expenses.  As of the Petition Date, LDR estimates that it owes less than $1,000 consisting of expenses relating to, among other things, business-related travel expenses, business meals, car

expenses, mileage reimbursements and other miscellaneous business expenses (collectively, the "Reimbursable Expenses").

70.     The Reimbursable Expenses were incurred by LDR's employees prior to the Petition Date on LDR's behalf and with the understanding that they would be repaid. LDR requests authority to pay the Reimbursable Expenses in the ordinary course of business.

71.     In connection with the payment of Payroll obligations, LDR is also obligated to withhold and pay federal, state and local withholding taxes for itself and its Employees. Historically, through its payroll processing, HS&A remits on LDR's behalf Payroll taxes directly to the appropriate taxing authorities.  LDR estimates that prepetition employer Payroll related taxes is approximately $12,000.

72.     LDR provides certain medical benefits to its Employees, including medical and dental coverage.  All Employees are insured through LDR, with medical coverage administered through Blue Cross and Blue Shield of Illinois ("BCBS") and dental coverage administered through Delta Dental ("Delta").  The group health and dental insurance is referred to collectively as the "Health Benefits".

73.     Each month, LDR pays approximately $53,000 to BCBS and $5,000 to Delta for administering the Health Benefits (the "Health Ins. Fees").  As of the Petition Date, LDR has paid the Health Ins. Fees through and including August 2014.  The Health Ins. Fees are due September 30, 2014 from the month of September 2014, and on the last day of each month thereafter.

74.     In addition, LDR provides all Employees with group life and long-term disability ("LTD") insurance coverage.  The group life and LTD insurance is offered through Lincoln Financial ("Lincoln") and is paid 100% by LDR.

75.     As of the Petition Date, LDR has paid the monthly premiums to Lincoln for group life and LTD insurance for the period covering August 2014.  LDR intends to maintain the group life and LTD coverage for its Employees during the pendency of this Chapter 11 Case.

76.     Employees are also eligible to participate in a 401(k) plan offered through LDR, wherein the Employees may contribute a certain percentage of their pre-tax compensation for retirement and savings investment (the "401(k) Plan").  The 401(k) Plan is administered by HS&A.  On a payroll basis LDR accrues 3% of an Employees' wages, per Employee, in a separate account maintained by HS&A, and contributes that amount to the Employee's 401(k) Plan at the end of each year.  In addition, for each pay period, LDR would match each Employee's contribution to the 401(k) Plan up to 3%.  As such, LDR may match up to 6% of an Employee's pre-tax wages for each Employee.

77.     There exists a critical need for LDR to promptly pay its prepetition wage claims of LDR's Employees, including outstanding wages and wage-related benefits, all related withholdings and taxes, accrued reimbursable business expenses and prepetition claims arising in connection with LDR's employee health, disability, and life insurance (collectively, the "Prepetition Employee Obligations").   The satisfaction of these Prepetition Employee Obligations is critical to LDR's ability to retain qualified employees to continue to operate its business for the benefit of the creditors and other interested parties in this Chapter 11 Case. These estimated amounts are included in anticipated disbursements allocated in the Budget, which is an exhibit to the Cash Collateral Order.

**E.     Proposed Motion to Extend Time to File Schedules and Statement of Financial Affairs.**

78.     LDR is currently assembling the information necessary to prepare and file its Schedules and Statement of Financial Affairs.  However, due to the number of pressing issues in

filing the Chapter 11 Case, LDR does not believe that it will be in a position to file its Schedules

and Statement of Financial Affairs within the 14 days allotted by Rule 1007(c).

79.     LDR anticipates that it will be in a position to file these materials within about 30

days of the Petition Date, and in any event at least five days prior to the first meeting of creditors

convened pursuant to section 341 of the Bankruptcy Code.

**F.     Utilities Motion**

80.     In the ordinary course of its business LDR uses water, electricity, gas, telephone

and other services of the same general type or nature (each a "Utility Service," and together the

"Utility Services") provided by various utility companies and other providers (each a "Utility

Company," and together the "Utility Companies").  A list of the Utility Companies is set forth in

"Exhibit A" to LDR's motion requesting authorization to pay deposit as adequate assurance of

payments for utility services.

81.     Maintaining uninterrupted Utility Services is essential to LDR's ongoing

operations.  Should the Utility Companies refuse or discontinue service, even for a brief period,

LDR's business operations will be adversely impacted and its efforts to reorganize will be

jeopardized.  It is therefore critical that the Utility Services provided by the Utility Companies

continue uninterrupted.

82.     I believe that a cash prepayment approximately equal to the average monthly

invoice or bill LDR received from each Utility Company as calculated over a 3-9 month period

prior to the Petition Date, as the case may be, will be sufficient to provide adequate assurance of

payment for post-petition Utility Services,.  The amount of the proposed Utility Prepayment for

each of the Utility Companies is specifically set forth on Exhibit A to LDR's motion concerning

utility payments and is included in the Budget.

### III. PROPOSED ASSET SALE

83.      As described above, after evaluating various strategic alternatives, LDR has concluded that the best mechanism for maximizing the value of the assets is through a sale on a going concern basis pursuant to Section 363 of the Code.

84.      LDR has begun marketing its business for sale to potential strategic buyers and has received a letter a letter of intent to acquire substantially all of LDR's assets pursuant to Section 363 of the Bankruptcy Code.  This proposal would provide for the satisfaction of the Pre-Petition Indebtedness owed to JPMC and a cash payment to the Debtor's estate.

85.      LDR intends to negotiate an asset purchase agreement with a qualified purchaser and then file a motion with this Court for approval of sale procedures and for authority to sell its assets to the proposed purchaser, or to such other party that submits the highest and best competing offer for LDR's assets.

86.      Subject to the approval of this Court and with the assistance of Silverman Consulting, LDR will market its assets and business in an effort to solicit further interest from other strategic and financial buyers and investors pursuant to the bidding process as will be described in the relevant motion.

87.      I believe that exigent circumstances warrant the sale of LDR's assets and business as a going concern on an expedited basis pursuant to the proposed bidding process.  A sale of LDR's assets pursuant to Section 363 of the Code appears to be the best mechanism to maximize the value of LDR's estate and the distribution to creditors in this Chapter 11 Case.  Prospective purchasers are likely to pay the highest purchase price for the subject assets if they can benefit from the continuation of LDR's valuable workforce, customer relationships and pending and upcoming customers.

### IV. APPLICATIONS TO EMPLOY LDR'S PROFESSIONALS

88.     In addition to the First-Day Motions and sale-related motions, LDR will be requesting the approval of employment of various professionals to aid in the administration of the Chapter 11 Case.  I believe the retention of these professionals is essential to a successful Chapter 11 Case and to LDR's ability to maximize the value of its estate for the benefit of its creditors.

A.     <u>Reed Smith, LLP</u>

89.     LDR has selected the law firm of Reed Smith, LLP. as its insolvency and restructuring counsel in the Chapter 11 Case.  Prior to the Chapter 11 Case, LDR retained Reed Smith, LLP to assist LDR in analyzing its alternatives and effectuating a course of action to address the difficulties facing it, in addition to Reed Smith's long term representation of LDR on general corporate and business issues.  I believe the continued representation of LDR by Reed Smith, LLP is critical to the success of the Chapter 11 Case because, among other things, the firm is familiar with LDR's business and legal affairs leading into the Chapter 11 Case.

90.     LDR selected Reed Smith,LLP as its attorneys because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Code, as well as its comprehensive experience with and knowledge of LDR and its business as well as the goals of the Chapter 11 Case.  Accordingly, I believe LDR should employ Reed Smith, LLP for its professional counseling and legal services in connection with the Chapter 11 Case.

B.     <u>Adducci, Mastriani & Schaumberg, LLP</u>

91.     LDR has selected Page Hall and the law firm of Adduccci, Mastriani & Schaumberg, LLP ("Adducci") to serve as special counsel for Customs and international trade

issues.  Adducci is very familiar with LDR's business and legal affairs, having provided services to LDR on Customs and trade issues since 2012.  Adducci is familiar with various outstanding and continuing legal issues involving the disputed Customs claim.

92.     I believe that Adducci has considerable experience in connection with Customs law in general and LDR's Customs issues in particular.  Accordingly, LDR should retain Adducci to represent it in connection with these issues as they may arise.

C.      Silverman Consulting

93.     LDR has selected the financial advisory firm of Silverman Consulting ("Silverman") as its financial advisors in the Chapter 11 Case.  Silverman has provided substantive and beneficial services to LDR for several weeks prior to the Petition Date, and has become familiar with LDR's business operations and books and records.

94.     Silverman was first retained by LDR in August 2014.  Since then, Silverman has assisted LDR with analyzing cash flow and providing other financial advisory services.  Silverman also advised LDR with respect to various restructuring options and initiatives, creditor recoveries and financial planning.  An experienced financial consulting firm such as Silverman fulfills a critical service that complements the services provided by LDR's employees and other professionals.

95.     As discussed further in the relevant motion, Silverman will concentrate its efforts on assisting and guiding LDR with the preparation of, among other things, cash flow budgeting and management, the analysis of creditor recoveries, the analysis of certain preference actions and other financial planning services as deemed appropriate by LDR's management.  As will be discussed in further detail in the relevant motion, a substantial portion of Silverman's engagement will be to conduct the marketing of LDR's business as a going concern to interested

parties, along with supervising the due diligence and sale process, in an effort to secure a buyer and effectuate a Section 363 sale. In addition to assisting LDR with preparation of the numerous exhibits required as part of the First-Day Motions, Silverman has assisted and will continue to assist LDR during the Chapter 11 Case in preparing LDR's bankruptcy schedules and statement of financial affairs. LDR's bankruptcy schedules and statement of financial affairs are detailed and complex, requiring the expertise, familiarity and resources of Silverman in preparing such documents in a timely and cost-efficient manner.

96.    I believe that Silverman has already become familiar with LDR's assets and business operations as set forth above and in the motion. Therefore, Silverman, which has had considerable experience in Chapter 11 cases as well as corporate and commercial matters, is well qualified to aid LDR in this Chapter 11 Case.

## V. CONCLUSION

73.    In order to minimize any loss to the value of LDR's business and to maximize the benefit to LDR's creditors and estate, LDR's immediate objective is to continue operating its business in the ordinary course following the commencement of the Chapter 11 Case, with as little interruption to its operations as possible. This will allow LDR to maximize the amount and quality of offers to acquire a substantial portion or substantially all of LDR's assets as a going concern. I believe that if the Court grants the relief requested in each of the First-Day Motions and other motions to follow, the prospect for achieving these objectives will be significantly enhanced.

William E. Underwood                          Dated: Sep 3, 2014