# EXHIBIT B

THOMPSON COBURN DRAFT 9/3/14

**THE CREDIT FACILITIES SET FORTH HEREIN ARE SUBJECT TO JPMORGAN CHASE BANK, N.A. CREDIT APPROVAL**



SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

_____, 2014

among

LDR INDUSTRIES, LLC,
600 N. KILBOURN, L.L.C.
GB HOLDINGS, INC.
LDR INTERNATIONAL, INC.

and

JPMORGAN CHASE BANK, N.A.

*CHASE BUSINESS CREDIT*

# TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS.................................................................................2
    SECTION 1.01. Defined Terms............................................................2
    SECTION 1.02. Classification of Loans and Borrowings ..........................19
    SECTION 1.03. Terms Generally .........................................................19
    SECTION 1.04. Accounting Terms; GAAP.............................................20
ARTICLE II - THE CREDITS...............................................................................20
    SECTION 2.01. Commitment...............................................................20
    SECTION 2.02. Loans and Borrowings.................................................20
    SECTION 2.03. Borrowing Procedures; Requests for Revolving Borrowings ....20
    SECTION 2.04. Protective Advances.....................................................21
    SECTION 2.05. Reserved....................................................................21
    SECTION 2.06. Funding of Borrowings.................................................21
    SECTION 2.07. Interest Elections........................................................21
    SECTION 2.08. Termination of Commitment..........................................21
    SECTION 2.09. Repayment and Amortization of Loans; Evidence of Debt.......21
    SECTION 2.10. Prepayment of Loans...................................................22
    SECTION 2.11. Fees.........................................................................23
    SECTION 2.12. Interest......................................................................23
    SECTION 2.13. Alternate Rate of Interest .............................................24
    SECTION 2.14. Increased Costs..........................................................24
    SECTION 2.15. Reserved...................................................................24
    SECTION 2.16. Taxes.......................................................................25
    SECTION 2.17. Payments Generally; Allocation of Proceeds .....................25
    SECTION 2.18. Indemnity for Returned Payments...................................26
    SECTION 2.19. DIP and Bankruptcy Provisions .....................................26
ARTICLE III - Representations and Warranties ....................................................29
    SECTION 3.01. Organization; Powers...................................................29
    SECTION 3.02. Authorization; Enforceability..........................................29
    SECTION 3.03. Governmental Approvals; No Conflicts..............................29
    SECTION 3.04. Budget .....................................................................29
    SECTION 3.05. Properties..................................................................30
    SECTION 3.06. Litigation and Environmental Matters ..............................30
    SECTION 3.07. Compliance with Laws and Agreements............................30
    SECTION 3.08. Investment Company Status...........................................30
    SECTION 3.09. Taxes.......................................................................30
    SECTION 3.10. ERISA ......................................................................30
    SECTION 3.11. Disclosure .................................................................31
    SECTION 3.12. Material Agreements ...................................................31
    SECTION 3.13. Solvency ...................................................................31
    SECTION 3.14. Insurance ..................................................................31
    SECTION 3.15. Capitalization and Subsidiaries ......................................31
    SECTION 3.16. Security Interest in Collateral..........................................31
    SECTION 3.17. Employment Matters....................................................32
    SECTION 3.18. Affiliate Transactions...................................................32
    SECTION 3.19. Common Enterprise.....................................................32
ARTICLE IV - CONDITIONS...............................................................................32
    SECTION 4.01. Effective Date.............................................................32
    SECTION 4.02. Each Credit Event.......................................................35
ARTICLE V - AFFIRMATIVE COVENANTS ...........................................................35

SECTION 5.01.  Financial Statements; Borrowing Base and Other Information ........................................35
SECTION 5.02.  Notices of Material Events .........................................................................................38
SECTION 5.03.  Existence; Conduct of Business ................................................................................38
SECTION 5.04.  Payment of Obligations .............................................................................................39
SECTION 5.05.  Maintenance of Properties .........................................................................................39
SECTION 5.06.  Books and Records; Inspection Rights ......................................................................39
SECTION 5.07.  Compliance with Laws ...............................................................................................39
SECTION 5.08.  Use of Proceeds and Letters of Credit ......................................................................39
SECTION 5.09.  Insurance ...................................................................................................................39
SECTION 5.10.  Casualty and Condemnation .....................................................................................39
SECTION 5.11.  Appraisals ..................................................................................................................39
SECTION 5.12.  Depository Banks .......................................................................................................40
SECTION 5.13.  Additional Collateral; Further Assurances .................................................................40
SECTION 5.14.  363 Sale .....................................................................................................................40
ARTICLE VI - NEGATIVE COVENANTS ..............................................................................................41
SECTION 6.01.  Indebtedness .............................................................................................................41
SECTION 6.02.  Liens ..........................................................................................................................42
SECTION 6.03.  Fundamental Changes ...............................................................................................43
SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions ..................................43
SECTION 6.05.  Asset Sales ...............................................................................................................44
SECTION 6.06.  Sale and Leaseback Transactions .............................................................................44
SECTION 6.07.  Swap Agreements ......................................................................................................44
SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness .........................................45
SECTION 6.09.  Transactions with Affiliates ........................................................................................45
SECTION 6.10.  Restrictive Agreements ..............................................................................................45
SECTION 6.11. Amendment of Material Documents ............................................................................46
SECTION 6.12.  Financial Covenants ..................................................................................................46
SECTION 6.13.  Management ...............................................................................................................46
ARTICLE VII - EVENTS OF DEFAULT ................................................................................................46
ARTICLE VIII - MISCELLANEOUS ......................................................................................................49
SECTION 8.01. Notices .......................................................................................................................49
SECTION 8.02.  Waivers; Amendments ..............................................................................................50
SECTION 8.03.  Expenses; Indemnity; Damage Waiver ......................................................................51
SECTION 8.04.  Successors and Assigns ............................................................................................52
SECTION 8.05.  Survival ......................................................................................................................53
SECTION 8.06.  Counterparts; Integration; Effectiveness ...................................................................53
SECTION 8.07.  Severability ................................................................................................................53
SECTION 8.08.  Right of Setoff ...........................................................................................................53
SECTION 8.09.  Governing Law; Jurisdiction; Consent to Service of Process .....................................54
SECTION 8.10.  WAIVER OF JURY TRIAL .........................................................................................54
SECTION 8.11.  Headings ....................................................................................................................54
SECTION 8.12.  Confidentiality ............................................................................................................54
SECTION 8.13.  Nonreliance; Violation of Law ....................................................................................55
SECTION 8.14.  USA PATRIOT Act .....................................................................................................55
SECTION 8.15.  Disclosure ..................................................................................................................55
SECTION 8.16.  Interest Rate Limitation ..............................................................................................55
SECTION 8.17.  Existing Credit Documents .........................................................................................55
ARTICLE IX - LOAN GUARANTY .........................................................................................................55
SECTION 9.01.  Guaranty ....................................................................................................................56
SECTION 9.02.  Guaranty of Payment .................................................................................................56
SECTION 9.03.  No Discharge or Diminishment of Loan Guaranty ......................................................56
SECTION 9.04.  Defenses Waived .......................................................................................................56
SECTION 9.05.  Rights of Subrogation .................................................................................................57

SECTION 9.06. Reinstatement; Stay of Acceleration .................................................................57
SECTION 9.07. Information.........................................................................................................57
SECTION 9.08. Termination ........................................................................................................57
SECTION 9.09. Taxes ..................................................................................................................57
SECTION 9.10. Maximum Liability.............................................................................................57
SECTION 9.11. Contribution .......................................................................................................58
SECTION 9.12. Liability Cumulative...........................................................................................58

<u>SCHEDULES</u>:

Schedule 3.05 - Properties
Schedule 3.06 - Disclosed Matters
Schedule 3.12 -Material Agreements
Schedule 3.14- Insurance
Schedule 3.15 - Capitalization and Subsidiaries
Schedule 3.18 - Affiliate Transactions
Schedule 6.01 - Existing Indebtedness
Schedule 6.02 - Existing Liens
Schedule 6.04 - Existing Investments
Schedule 6.10 - Existing Restrictions

<u>EXHIBITS</u>:

Exhibit A - Form of Borrowing Base Certificate
Exhibit B - Form of Compliance Certificate
Exhibit C - Joinder Agreement
Exhibit D – Budget
Exhibit E  – Existing Letters of Credit

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of _____, 2014 (as it may be amended, modified and/or supplemented from time to time, this "Agreement"), by and among LDR Industries, LLC, an Illinois limited liability company, and a debtor and debtor-in-possession ("Borrower"), 600 N. Kilbourn, L.L.C., an Illinois limited liability company ("Kilbourn"), GB Holdings, Inc, an Illinois corporation ("Holdings"), LDR International, Inc., an Illinois corporation ("LDR International"; and collectively, with Borrower, Kilbourn and Holdings, the "Loan Parties" and each a "Loan Party"), and JPMORGAN CHASE BANK, N.A. ("Lender").

WHEREAS, Borrower, Kilbourn, Holdings, LDR International and Lender entered into a Credit Agreement dated as of June 26, 2013 (as such agreement may have been amended, modified and supplemented to the date hereof, and including the schedules and exhibits thereto, the "Prepetition Credit Agreement"); and

WHEREAS, on September 2, 2014 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), and Borrower continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code (such Chapter 11 proceeding is being administered as Case No. 14-32138 and is herein referred to as the "Chapter 11 Case"); and

WHEREAS, under the Prepetition Credit Agreement and the documents executed in connection therewith (the "Existing Credit Documents"), Lender made certain loans and other financial accommodations to Borrower and Kilbourn (the obligations of the Loan Parties under the Existing Credit Documents being the "Existing Obligations"); and

WHEREAS, the Loan Parties each acknowledge that the Existing Obligations under the Existing Credit Documents are secured by Liens on all of the tangible and intangible personal property of each of the Loan Parties and the real estate and improvements located at 600 N. Kilbourn Avenue, Chicago, Illinois, owned by Kilbourn (collectively, the "Existing Collateral"); and

WHEREAS, each of the Loan Parties acknowledge that all existing cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents of Borrower and the proceeds, products, offspring, rents or other profits of property of Borrower that comprise the Existing Collateral (whether existing before or after the commencement of the Chapter 11 Case) constitute the cash collateral of Lender (the "Cash Collateral"); and

WHEREAS, Borrower desires to pursue a sale of its assets under Section 363 of the Bankruptcy Code (a "363 Sale") in the Chapter 11 Case; and

WHEREAS, Borrower has an immediate need for additional funds to continue to operate its business as a debtor-in-possession under the Chapter 11 Case in order to conduct a successful 363 Sale; and

WHEREAS, Borrower has requested that Lender provide a senior secured superpriority revolving credit facility to Borrower in an amount of up to $2,000,000 in the aggregate, on and subject to the terms and conditions set forth herein (the "DIP Facility"); and

WHEREAS, Lender is willing to provide the DIP Facility only if it constitutes an allowed superpriority administrative expense claim with priority over all other administrative expense claims in the Chapter 11 Case or any subsequent bankruptcy case as set forth herein and as more specifically set forth hereinbelow, and is secured by a first priority Lien, superior to all other Liens held by any other lienholder, on all of the tangible and intangible personal property of each Loan Party and the real estate and improvements located at 600 N. Kilbourn Avenue, Chicago, Illinois; and

WHEREAS, Borrower is unable to obtain funds or credit on any other terms and there is adequate protection of the interests of the other lienholders whose Liens are being subordinated to Lender's superpriority Lien provided for in this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Loan Parties and Lender hereby mutually covenant and agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"363 Sale" has the meaning set forth in the preamble.

"Account" has the meaning assigned to such term in the Security Agreement.

"Account Debtor" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Adjusted LIBO Rate" means, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for a one month interest period multiplied by (b) the Statutory Reserve Rate.

"Adjusted One Month LIBOR Rate" means, for any day, an interest rate per annum equal to the sum of (i) 2.50% plus (ii) the Adjusted LIBO Rate for a one-month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day); provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page) at approximately 11:00 a.m. London time on such day (without any rounding).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Applicable Rate" means, for any day, with respect to any Revolving Loan, 1.00% per annum.

"Approved Fund" has the meaning assigned to such term in Section 8.04(b).

"Availability" means, with respect to Borrower, at any time, an amount equal to (a) the lesser of (i) the Revolving Commitment and (ii) the Borrowing Base minus (b) the aggregate outstanding principal amount of Revolving Loans at such time.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitment.

"Available Revolving Commitment" means, at any time, the Revolving Commitment minus the outstanding principal amount of Revolving Loans at such time.

2

"Banking Services" means each and any of the following bank services provided to any Loan Party by the Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Banking Services Obligations" of the Loan Parties means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"Banking Services Reserves" means all Reserves which the Lender from time to time establishes in its Permitted Discretion for Banking Services then provided or outstanding.

"Bankruptcy Code" has the meaning set forth in the preamble.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the preamble.

"Borrowing" means (a) Revolving Loans made on the same date and, and (b) a Protective Advance.

"Borrowing Base" means, at any time, with respect to Borrower, the sum of

(a)     85.0% of Borrower's Eligible Accounts at such time, *plus*

(b)     the lesser of (i) 65.0% of Borrower's Eligible Inventory, valued at the lower of cost or market value, determined on a first in first out basis, and (ii) the product of 85.0% multiplied by the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the Lender multiplied by Borrower's Eligible Inventory, valued at the lower of cost or market value, determined on a first in first out basis, *plus*

(c)     $2,000,000.00; *plus*

(d)     Borrower's cash on deposit at Lender in the [Collection Account]; *minus*

(e)     Reserves; *minus*

(f)     Existing Obligations totalling $16,356,801.25 (representing the principal amount of the revolving credit facility under the Prepetition Credit Agreement in the amount of $14,816,801.25, plus the "LC Exposure" under and as defined in the Prepetition Credit Agreement, with respect to the Existing Letters of Credit in the face amount of $1,540,000), less an amount equal to the face amount of any Existing Letters of Credit that, after the date of this Agreement, either (i) expire pursuant to their terms and as to which no draws are thereafter permitted, or (ii) that are returned to Lender undrawn and are cancelled.

The maximum amount of Inventory which may be included as part of the Borrowing Base is $10,000,000.00. The Lender may, in its Permitted Discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base.

"<u>Borrowing Base Certificate</u>" means a certificate, signed and certified as accurate and complete by a Financial Officer of Borrower, in substantially the form of <u>Exhibit A</u> or another form which is acceptable to the Lender in its sole discretion.

"<u>Borrowing Request</u>" means a request by the Borrower for a Revolving Borrowing in accordance with Section 2.03.

"<u>Budget</u>" means, (a) prior to the entry of the Final Order, a 13-week cash flow budget of the Borrower and its Subsidiaries provided to Lender hereunder and updated pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to Lender, and (b) from and after the entry of the Final Order, a weekly cash flow budget of the Borrower and its Subsidiaries provided to Lender hereunder and updated pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to Lender; provided, however, the cash flow budget and weekly updates thereto delivered to Lender under this clause (b) shall extend for a term of no less than 13 weeks and shall provide forecasted cash flow information through the period ending no earlier than the Maturity Date. The initial Budget is attached hereto as <u>Exhibit D</u> and incorporated herein by reference.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in Chicago, Illinois, are authorized or required by law to remain closed.

"<u>Capital Expenditures</u>" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrowers and their prepared in accordance with GAAP.

"<u>Capital Lease Obligations</u>" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"<u>Cash Collateral</u>" has the meaning set forth in the preamble.

"<u>CB Floating Rate</u>" means the Prime Rate; provided that the CB Floating Rate shall never be less than the Adjusted One Month LIBOR Rate for a one month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day). Any change in the CB Floating Rate due to a change in the Prime Rate or the Adjusted One Month LIBOR Rate shall be effective from and including the effective date of such change in the Prime Rate or the Adjusted One Month LIBOR Rate, respectively.

"<u>CBFR</u>", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the CB Floating Rate.

"<u>Change in Control</u>" means (a) Dennis Greenspon and Larry Greenspon, directly or indirectly, shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of Holdings, Kilbourn or Borrower on a fully diluted basis; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings, Kilbourn or Borrower by Persons who were neither (i) nominated by the board of directors of Holdings, Kilbourn or Borrower, as the case may be, nor (ii) appointed by directors so nominated; or (c) the acquisition of direct or indirect Control of Holdings, Kilbourn or Borrower by any Person or group other than Dennis Greenspon and Larry Greenspon.

"<u>Change in Law</u>" means (a) the adoption of any law, rule, regulation or treaty (including any rules or regulations issued under or implementing any existing law) after the date of this Agreement, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by the Lender (or, for purposes of Section 2.14(b), by any lending office of the Lender or by the Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; <u>provided</u> that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform

4

and Consumer Protection Act and all requests, rules, guidelines or directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Case" has the meaning set forth in the preamble.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Protective Advances.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Lender, to secure the Secured Obligations.

"Collateral Access Agreement" has the meaning assigned to such term in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement, the Mortgages and any other documents pursuant to which a Person grants a Lien upon any real or personal property as security for payment of the Secured Obligations.

"Collection Account" has the meaning assigned to such term in the Security Agreement.

"Commitment" means the Revolving Commitment.

"Commitment Fee Rate" means .25% per annum.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Disbursement Account" means the following account: 219696957; and any replacement or additional accounts of the Borrower maintained with the Lender as a zero balance, cash management account pursuant to and under any agreement between the Borrower and the Lender, as modified and amended from time to time, and through which all disbursements of the Borrower, any Loan Party and any designated Subsidiary of the Borrower are made and settled on a daily basis with no uninvested balance remaining overnight.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DIP Facility" has the meaning set forth in the preamble.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Document" has the meaning assigned to such term in the Security Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

5

"EBITDA" means, for any period, Net Income for such period *plus* (a) without duplication and to the extent deducted in determining Net Income for such period, the sum of (i) Interest Expense for such period, (ii) income tax expense for such period, (iii) all amounts attributable to depreciation and amortization expense for such period, and (iv) any extraordinary charges for such period, (v) any other non-cash charges for such period (but excluding any non-cash charge in respect of an item that was included in Net Income in a prior period), *minus* (b) without duplication and to the extent included in Net Income, any extraordinary gains and any non-cash items of income for such period, all calculated for Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02).

"Eligible Accounts" means, at any time, the Accounts of the Borrower which the Lender determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans.  Without limiting the Lender's discretion provided herein, Eligible Accounts shall not include any Account:

(a)     which is not subject to a first priority perfected security interest in favor of the Lender;

(b)     which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)     (i) which is unpaid more than 90 days after the date of the original invoice therefor ("Overage") (when calculating the amount under this clause (i), for the same Account Debtor, Lender shall include the net amount of such Overage and add back any credits, but only to the extent that such credits do not exceed the total gross receivables from such Account Debtor), or (ii) which has been written off the books of the Borrower or otherwise designated as uncollectible;

(d)     which is owing by an Account Debtor for which more than 25% of the Accounts owing from such Account Debtor and its Affiliates are ineligible pursuant to clause (c) above;

(e)     which is (i) owing by an Account Debtor (other than The Home Depot and Menards, Inc.) to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Borrower exceeds 25% of the aggregate amount of Eligible Accounts of Borrower, or (ii) owing by The Home Depot or Menards, Inc. to the extent the aggregate amount of Accounts owing from either such Account Debtor and its Affiliates to the Borrower exceeds 35% of the aggregate amount of Eligible Accounts of the Borrower.  Notwithstanding the foregoing, Lender in its Permitted Discretion may increase the concentration percent limitations set forth in this clause (e) for any one or more Account Debtors by providing written notice thereof to the Borrower specifying the Account Debtor subject to such increase, the increased concentration percent and the duration thereof.  Such increase may be provided in connection with an Account that is subject to an account guaranty program provided by Lender to the Borrower from time to time or such other reason as Lender may determine in its Permitted Discretion;

(f)     with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(g)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Lender which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon the Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(h)      for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by the Borrower or if such Account was invoiced more than once;

(i)      with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)      which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)      which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)      which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S., Puerto Rico, Canada, or any province of Canada unless, in either case, such Account is backed by a Letter of Credit acceptable to the Lender which is in the possession of, and is directly drawable by the Lender;

(m)      which is owed in any currency other than U.S. or Canadian dollars;

(n)      which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Lender which is in the possession of, and is directly drawable by, the Lender, or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Lender in such Account have been complied with to the Lender's satisfaction;

(o)      which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p)      which, for any Account Debtor, exceeds a credit limit determined by the Lender, to the extent of such excess;

(q)      which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent of such indebtedness or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)      which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(s)      which is evidenced by any promissory note, chattel paper, or instrument;

(t)      which is owed by an Account Debtor (other than Target Corporation) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit LDR to seek judicial enforcement in such jurisdiction of payment of such Account, unless the Borrower has filed such report or qualified to do business in such jurisdiction;

(u)     with respect to which the Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and the Borrower created a new receivable for the unpaid portion of such Account;

(v)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than the Borrower has or has had an ownership interest in such goods, or which indicates any party other than the Borrower as payee or remittance party;

(x)     which was created on cash on delivery terms; or

(y)     which Lender determines may not be paid by reason of the Account Debtor's inability to pay or which Lender otherwise determines in its Permitted Discretion is unacceptable.

In the event that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate.  In determining the amount of an Eligible Account, the face amount of an Account may, in the Lender's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrower to reduce the amount of such Account.

"Eligible Inventory" means, at any time, the Inventory of the Borrower which the Lender determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans hereunder. Without limiting the Lender's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Lender;

(b)     which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)     which is, in the Lender's Permitted Discretion, slow moving, obsolete, unmerchantable, defective, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true and which does not conform to all standards imposed by any Governmental Authority;

(e)     in which any Person other than the Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)     which is not finished goods or which constitutes work-in-process, raw materials, spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)      which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers, provided that, up to **[$2,500,000]** of Inventory in transit from vendors and suppliers may be included as Eligible Inventory despite the foregoing provision of this clause (g) so long as:

(i)      such Inventory has been shipped for receipt by the Borrower within forty-five (45) days of the date of shipment, but which has not yet been delivered to or on behalf of the Borrower;

(ii)      Lender or a customs broker that has executed a Collateral Access Agreement in favor of Administrative Agent shall have received a true and correct copy of the negotiable bill of lading and other shipping documents for such Inventory, and Lender shall have received evidence of satisfactory casualty insurance naming Lender as loss payee and otherwise covering such risks as Lender may reasonably request,

(iii)      Lender shall have received confirmation that the bill is issued in the name of the Borrower and consigned to the order of Lender, and a Collateral Access Agreement has been executed with the Borrower's customs broker,

(iv)      Lender shall have established a Reserve, if it determines a Reserve is needed, in its Permitted Discretion for customs duties and customs fees associated with such Inventory,

(v)      no default exists under any agreement in effect between the vendor of such Inventory and the Borrower that would permit such vendor under any applicable law to divert, reclaim, reroute or stop shipment of such Inventory,

(vi)      the common carrier is not an Affiliate of the applicable vendor or supplier, and

(vii)      the customs broker is not an Affiliate of any Loan Party;

(h)      which is located in any location leased by the Borrower unless (i) the lessor has delivered to the Lender a Collateral Access Agreement or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the Lender in its Permitted Discretion;

(i)      which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document (other than bills of lading to the extent permitted pursuant to clause (g) above), unless (i) such warehouseman or bailee has delivered to the Lender a Collateral Access Agreement and such other documentation as the Lender may require or (ii) an appropriate Reserve has been established by the Lender in its Permitted Discretion;

(j)      which is being processed offsite at a third party location or outside processor, or is in transit to or from such third party location or outside processor;

(k)      which is a discontinued product or component thereof;

(l)      which is the subject of a consignment by the Borrower as consignor;

(m)      which is perishable;

(n)      which contains or bears any intellectual property rights licensed to the Borrower unless the Lender is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with

9

respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o)    which is not reflected in a current perpetual inventory report of the Borrower (unless such Inventory is reflected in a report to the Lender as "in transit" Inventory);

(p)    for which reclamation rights have been asserted by the seller; or

(q)    which Lender otherwise determines in its Permitted Discretion is unacceptable.

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning assigned to such term in the Security Agreement.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with a Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Swap Obligation" means, with respect to any Loan Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Guarantor of , or the grant by such Loan Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (a) by virtue of such Loan Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Loan Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation or (b) in the case of a Swap Obligation subject to a clearing requirement pursuant to Section 2(h) of the Commodity Exchange Act (or any successor provision thereto), because such Loan Guarantor is a "financial entity," as defined in Section 2(h)(7)(C)(i) the Commodity Exchange Act (or any successor provision thereto), at the time the Guarantee of such Loan Guarantor becomes or would become effective with respect to such related Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to any payment made by any Loan Party under this Agreement, any of the following Taxes imposed on or with respect to the Lender: (a) income or franchise Taxes imposed on (or measured by) net income by the United States of America, or by the jurisdiction under the laws of which the Lender is organized or in which its principal office or applicable lending office is located, and (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction in which any Borrower is located.

"Existing Collateral" has the meaning set forth in the preamble.

"Existing Credit Documents" has the meaning set forth in the preamble.

"Existing Letters of Credit" means the letters of credit outstanding as of the date of this Agreement issued by Lender for Borrower's account pursuant to the Prepetition Credit Agreement as described on Exhibit

"Existing Obligations" has the meaning set forth in the preamble.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Lender from three Federal funds brokers of recognized standing selected by it.

"Final Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) in form and substance satisfactory to Lender, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent of Lender and approved by the Bankruptcy Court.

"Final Order Date" shall mean the date of entry of the Final Order by the Bankruptcy Court.

"First Day Orders" shall mean those orders entered by the Bankruptcy Court as a result of motions and applications filed by the Borrower as debtor with the Bankruptcy Court on or immediately following the Petition Date, in each case in form and substance as approved by Lender pursuant to the terms of Section 5.01 of this Agreement.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"First Amendment to Mortgage" means that certain First Amendment to Mortgage Documents of even date herewith by and between Kilbourn and Lender.

"Fixtures" has the meaning assigned to such term in the Security Agreement.

"Funding Account" has the meaning assigned to such term in Section 4.01(h).

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" means GB Holdings, Inc., an Illinois corporation.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any liquidated earn-out and (l) any other Off-Balance Sheet Liability of such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by the Borrowers under this Agreement and (b) Other Taxes.

"Interest Expense" means, for any period, the interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Borrower and its Subsidiaries for such period in accordance with GAAP.

"Interest Payment Date" means the first day of each calendar month and the Maturity Date.

"Interim Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing under Bankruptcy Rule 4001(c)(2) in form and substance satisfactory to Lender, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent of Lender and approved by the Bankruptcy Court.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means a Joinder Agreement in substantially the form of Exhibit C.

"Kilbourn Membership Pledge Agreement" means that certain Membership Interest Pledge Agreement dated as of June 26, 2013, executed and delivered by all members of Kilbourn in favor of Lender, as amended by that certain First Amendment to Membership Pledge Agreement dated as of the date hereof and as the same may be further amended or restated from time to time.

"Lender" means JPMorgan Chase Bank, N.A., its successors and assigns.

"LIBO Rate" means, as of any date of determination, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page on such screen) at approximately 11:00 a.m., London time, as the rate for dollar deposits with a maturity of one month.  In the event that such rate does not appear on such page (or on any successor or substitute page on such screen or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying interest rates for dollar deposits as may be selected by Lender or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity of one month are offered by the principal London office of Lender in immediately available funds in the London interbank market at approximately 11:00 a.m., London time.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, any promissory notes issued pursuant to this Agreement, the Collateral Documents, the Loan Guaranty, and all other agreements, instruments, documents and certificates identified in Section 4.01 executed and delivered to, or in favor of, the Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Lender in connection with this Agreement or the transactions contemplated hereby.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantor" means each Loan Party other than the Borrower.

"Loan Guaranty" means Article IX of this Agreement and each separate Guarantee, in form and substance satisfactory to the Lender, delivered by each other Loan Guarantor, as it may be amended or modified and in effect from time to time.

"Loan Parties" means Holdings, Kilbourn, LDR International, the Borrower, the Borrower's Subsidiaries (excluding any foreign Subsidiaries) and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their successors and assigns.

"Loans" means the loans and advances made by the Lender pursuant to this Agreement, including Protective Advances.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under the Loan Documents to which it is a party, (c) the Collateral, or the Lender's Liens (on behalf of itself and the Lender) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Lender under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrowers and their Subsidiaries in an aggregate principal amount exceeding $1,000,000. For purposes of determining Material Indebtedness, the "obligations" of any Borrower or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means **[December 31]**, 2014, or any earlier date on which the Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof.

"Maximum Liability" has the meaning assigned to such term in Section 9.10.

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means individually and collectively, (a) that certain Amended and Restated Mortgage and Security Agreement dated as of June 26, 2013, executed and delivered by Kilbourn to Lender, as amended by that certain First Amendment to Amended and Restated Mortgage and Security Agreement dated as of the date hereof and as the same may be further amended or restated from time to time, and (b) any other mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Lender, on real property of a Loan Party, including any amendment, modification or supplement thereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Income" means, for any period, the consolidated net income (or loss) of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary) in which the Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or a Subsidiary of the Borrower in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Net Orderly Liquidation Value" means, with respect to Inventory of any Person, the orderly liquidation value thereof as determined in a manner acceptable to Lender by an appraiser acceptable to Lender, net of all costs of liquidation thereof.

"<u>Net Proceeds</u>" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"<u>Non-Paying Guarantor</u>" has the meaning assigned to such term in Section 9.11.

"<u>Obligated Party</u>" has the meaning assigned to such term in Section 9.02.

"<u>Obligations</u>" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to the Lender or any indemnified party arising under the Loan Documents; provided, however, that the definition of 'Obligations' shall not create any guarantee by any Loan Guarantor of (or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor.

"<u>Off-Balance Sheet Liability</u>" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person,, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

"<u>Orders</u>" means the Interim Order together with the Final Order.

"<u>Other Connection Taxes</u>" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Taxes (other than a connection arising from the Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Document), or sold or assigned an interest in any Loan Document.

"<u>Other Taxes</u>" means any present or future stamp, court, documentary, intangible, recording, filing or similar excise or property Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the registration, receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"<u>Participant</u>" has the meaning assigned to such term in Section 9.04(c).

"<u>Paying Guarantor</u>" has the meaning assigned to such term in Section 9.11.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII; and

(f)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (e) above.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)    money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

16

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the preamble.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means:

(a)    any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Section 6.05(a); or

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party; or

(c)    the issuance by Holdings, Kilbourn or the Borrower of any Equity Interests, or the receipt by Holdings, Kilbourn or the Borrower of any capital contribution, other than any issuance by Kilbourn or the Borrower of common Equity Interests to, or receipt of any such capital contribution from, Holdings; or

(d)    the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prepetition Credit Agreement" has the meaning set forth in the preamble.

"Prepetition Indebtedness" shall mean all Indebtedness of the Borrower incurred or assumed prior to the Petition Date, other than the Existing Obligations.

"Prepetition Revolving Loan" means that portion of the Existing Obligations constituting the "Revolving Loan" under the Prepetition Credit Agreement.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by the Lender as its prime rate; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Projections" has the meaning assigned to such term in Section 5.01(e).

"Protective Advance" has the meaning assigned to such term in Section 2.04.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualifying Sale" has the meaning set forth in Section 5.14.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"<u>Report</u>" means reports prepared by the Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Loan Parties from information furnished by or on behalf of the Borrower, after the Lender has exercised its rights of inspection pursuant to this Agreement.

"<u>Requirement of Law</u>" means, as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Reserves</u>" means any and all reserves which the Lender deems necessary, in its Permitted Discretion, to maintain (including, without limitation, an availability reserve, reserves for accrued and unpaid interest on the Secured Obligations, Banking Services Reserves, volatility reserves, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Swap Obligations, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, un indemnified or under indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, Kilbourn or the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings, Kilbourn or the Borrower or any option, warrant or other right to acquire any such Equity Interests in Holdings, Kilbourn or the Borrower.

"<u>Revolving Commitment</u>" means during the term of the Interim Order, **[$1,250,000.00]** and during the term of the Final Order, $2,000,000.00.

"<u>Revolving Loan</u>" means a Loan made pursuant to Section 2.01.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"<u>Secured Obligations</u>" means all Obligations, together with all (i) Banking Services Obligations and (ii) Swap Obligations owing to the Lender or its Affiliates.

"<u>Security Agreement</u>" means that certain Pledge and Security Agreement, dated as of the date hereof, between the Loan Parties and the Lender, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document), or any other Person, as the same may be amended, restated or otherwise modified from time to time.

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Lender is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Subordinated Indebtedness</u>" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Lender.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of Holdings, Kilbourn, the Borrower or other Loan Party, as applicable.

"Swap Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligations" of a Loan Party means any and all obligations to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"Taxes" means any present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means that portion of the Existing Obligations constituting the "Term Loan."

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement, the borrowing of Loans and other credit extensions and the use of the proceeds thereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means the Borrower and the Lender.

SECTION 1.02.  Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan").  Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing").

SECTION 1.03.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to

any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04.  <u>Accounting Terms; GAAP.</u>  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such migration or change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

ARTICLE II

The Credits

SECTION 2.01.  <u>Commitment.</u>  Subject to the terms and conditions set forth herein, the Lender agrees to make Revolving Loans to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (i) the outstanding principal amount of Revolving Loans at such time exceeding the lesser of (x) the Revolving Commitment or (y) the Borrowing Base, subject to the Lender's authority, in its Permitted Discretion, to make Protective Advances pursuant to the terms of Section 2.04.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

SECTION 2.02.  <u>Loans and Borrowings.</u>  (a)  Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class.  Any Protective Advance shall be made in accordance with the procedures set forth in Section 2.04.

(b)  Each Revolving Borrowing shall be comprised entirely of CBFR Loans.

SECTION 2.03.  <u>Borrowing Procedures; Requests for Revolving Borrowings.</u>

(a)  <u>Controlled Disbursement Account.</u>  Not later than noon, Chicago time, on each Business Day, the Borrower shall, subject to the conditions of this Agreement, request a Revolving Loan in the amount necessary, if any, to pay items to be drawn on the Controlled Disbursement Accounts that day.  Subject to Borrower's satisfaction of the conditions to each Revolving Loan, Lender shall make available to the Borrower, by a credit to the Funding Account, the proceeds of such Revolving Loan.  All other Revolving Loans shall be made upon notice given in accordance with §2.03(b).

(b)  <u>Notices by the Borrower to the Lender of requests for Revolving Loans other than pursuant to §2.03(a).</u>  To request a Revolving Borrowing, the Borrower shall notify the Lender of such request by telephone not later than noon, Chicago time, on the date of the proposed Borrowing.  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Lender of a

written Borrowing Request in a form approved by the Lender and signed by the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.01:

(i)      the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing; and

(ii)     the date of such Borrowing, which shall be a Business Day.

SECTION 2.04.   Protective Advances.   Subject to the limitations set forth below, the Lender is authorized by the Borrower, from time to time in the Lender's Permitted Discretion (but shall have absolutely no obligation to), to make Loans to the Borrower, which the Lender, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Loan Parties to Lender pursuant to the terms of this Agreement, including payments of principal, interest, fees, premiums, reimbursable expenses (including costs, fees, and expenses as described in Section 8.03) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "Protective Advances"); provided that, the aggregate amount of outstanding Protective Advances plus the aggregate outstanding principal amount of Revolving Loans at such time shall not exceed the aggregate Revolving Commitment.  Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied.  The Protective Advances shall be secured by the Liens in favor of the Lender in and to the Collateral and shall constitute Obligations hereunder.  All Protective Advances shall be CBFR Borrowings.

SECTION 2.05.   Reserved.

SECTION 2.06.   Funding of Borrowings.   The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrower by promptly crediting the amounts in immediately available funds, to the Funding Account(s); provided that a Protective Advance made pursuant to Section 2.04 shall be retained by the Lender.

SECTION 2.07.   Interest Elections.   Each Revolving Borrowing shall be a CBFR Borrowing.

SECTION 2.08.   Termination of Commitment.   (a)  Unless previously terminated, the Revolving Commitments shall terminate on the Maturity Date.

(b)      The Borrower may at any time terminate the Revolving Commitment upon (i) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (ii) the payment in full of the accrued and unpaid fees, including applicable Prepayment Fee (if any), and (iii) the payment in full of all reimbursable expenses and other Obligations together with accrued and unpaid interest thereon.

(c)      The Borrower shall notify the Lender of any election to terminate the Revolving Commitment under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination, specifying such election and the effective date thereof.  Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Lender on or prior to the specified effective date) if such condition is not satisfied.  Any termination of the Revolving Commitment shall be permanent.

SECTION 2.09.   Repayment and Amortization of Loans; Evidence of Debt.   The Borrower hereby unconditionally promises to pay (i) to the Lender for its account the then unpaid principal amount of each Revolving Loan on the Maturity Date and (ii) to the Lender the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the Lender.

(b)      Each Business Day, Lender shall apply all funds credited to the Collection Account on such Business Day or the immediately preceding Business Day (at the discretion of the Lender, whether or not

immediately available) <u>first</u> to prepay any Protective Advances that may be outstanding, and <u>second</u> to prepay the Revolving Loans.  If pursuant to the foregoing, the Revolving Loans are paid down to $0 and not re-borrowed hereunder, the excess funds credited to the Collection Account shall be held with Lender and may be used by Borrower for items in the then approved Budget.

(c)    The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(d)    The Lender shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.

(e)    The entries made in the accounts maintained pursuant to paragraph (c) or (d) of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(f)    The Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to the Lender a promissory note payable to the order of the Lender (or, if requested by the Lender, to the Lender and its registered assigns) and in a form approved by the Lender. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(g)    Notwithstanding the foregoing, amounts received from any Loan Party that is not a Qualified ECP Guarantor shall not be applied to the Borrower Obligations that are Excluded Swap Obligations.

SECTION 2.10.  <u>Prepayment of Loans.</u>  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (f) of this Section.

(b)    In the event and on such occasion that the aggregate outstanding principal amount of Revolving Loans at such time exceeds the lesser of (A) the Revolving Commitment and (B) the Borrowing Base, the Borrower shall prepay the Revolving Loans in an aggregate amount equal to such excess.

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings or any other Loan Party in respect of any Prepayment Event, the Borrower shall, immediately after such Net Proceeds are received by Holdings or any other Loan Party, prepay the Obligations as set forth in Section 2.10(e) below in an aggregate amount equal to 100% of such Net Proceeds, <u>provided</u> that, in the case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event" with respect to Kilbourn's real property or Fixtures, such proceeds shall be applied to the Term Loan, until the Term Loan is paid in full, and thereafter applied in accordance with Section 2.10(e).

(d)    [Reserved].

(e)    All such prepayments required pursuant to Section 2.10(c) (as to any insurance or condemnation proceeds, to the extent they arise from casualties or losses to Inventory and Equipment) shall be applied, <u>first</u> to prepay any Protective Advances that may be outstanding, <u>second</u> to prepay the Revolving Loans with a corresponding reduction in the Revolving Commitment (unless Lender otherwise elects) and, if the Revolving Loans are paid down to zero Dollars, the excess cash proceeds shall be held in Borrower's Operating Account and used to fund operating expenses of the Borrower, the costs and expenses of administering the Chapter 11 Case and other payments as set forth in the approved Budget.  All such prepayments required pursuant to

Section 2.10(c) (as to any Prepayment Event under clause (c) or (d) of such definition or insurance or condemnation proceeds, to the extent they arise from casualties or losses to any personal property other than Inventory and Equipment) shall be applied, <u>first</u> to prepay any Protective Advances that may be outstanding, <u>second</u> to prepay the Revolving Loans with a corresponding reduction in the Revolving Commitment (unless Lender otherwise elects) and, if the Revolving Loans are paid down to zero Dollars, the excess cash proceeds shall be held in Borrower's Operating Account and used to fund operating expenses of the Borrower, the costs and expenses of administering the Chapter 11 Case and other payments as set forth in the approved Budget.  If the precise amount of insurance or condemnation proceeds allocable to Inventory as compared to Equipment is not otherwise determined, the allocation and application of those proceeds shall be determined by the Lender, in its Permitted Discretion.

(f)    The Borrower shall notify the Lender by telephone (confirmed by facsimile) of any prepayment hereunder not later than 10:00 a.m., Chicago time, in the case of prepayment of a Revolving Borrowing on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; <u>provided</u> that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitment as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.12.

SECTION 2.11.  <u>Fees.</u>  (a)  the Borrower agrees to pay to the Lender a commitment fee, which shall accrue at the Commitment Fee Rate on the average daily amount of the Available Revolving Commitment of the Lender during the period from and including the Effective Date to but excluding the date on which the Lender's Revolving Commitment terminates.  Accrued commitment fees shall be payable in arrears on the first day of each calendar month and on the date on which the Revolving Commitment terminates, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

(b)    [Reserved.]

(c)    The Borrower agrees to pay to the Lender a facility fee in an aggregate amount equal to $25,000.  The entire facility fee shall be deemed fully earned by the Lender on the Effective Date and shall be due and payable in full upon the entry of the Final Order.

(d)    The Borrower agrees to pay to the Lender a fee equal to the additional interest that the Borrowers would have paid in respect of the Revolving Loans, at the CBFR plus the Applicable Rate, as if each uncollected check had not been received in the collection account and credited to the Borrowers until the earlier of (i) the date that such check is actually collected and (ii) three Business Days after the Business Day that such check was actually received in the collection account.  Such fee will be payable monthly in arrears.

(e)    All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender.  Fees paid shall not be refundable under any circumstances.

SECTION 2.12.  <u>Interest.</u>  (a)  The Loans shall bear interest at the CB Floating Rate plus the Applicable Rate.

(b)    [Reserved].

(c)    Each Protective Advance shall bear interest at the CB Floating Rate plus the Applicable Rate for Revolving Loans plus 2%.

(d)    Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Lender may, at its option, by notice to the Borrower, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(e)      Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitment; provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)      All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed.  The applicable CB Floating Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.13.  Reserved .

SECTION 2.14.  Increased Costs.  (a)  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      impose on the Lender or the London interbank market any other condition affecting this Agreement; or

(iii)      subject the Lender to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto (other than (A) Indemnified Taxes and (B) Other Connection Taxes on gross or net income, profits or receipts (including value-added or similar Taxes));

and the result of any of the foregoing shall be to to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)      If the Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, as a consequence of this Agreement or the Loans made by the Lender to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c)      A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of the Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15.  Reserved .

SECTION 2.16.  Taxes.  (a) Withholding of Taxes; Gross-Up.  Each payment by any Loan Party under any Loan Document shall be made without withholding for any Taxes, unless such withholding is required by any law.  If any Withholding Agent determines, in its Permitted Discretion, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Party shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

(b)    Payment of Other Taxes by the Borrower.  The Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)    Indemnification by the Borrower.  The Loan Parties shall jointly and severally indemnify the Lender for any Indemnified Taxes that are paid or payable by the Lender in connection with any Loan Document (including amounts paid or payable under this Section 2.16(d)) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 2.16(d) shall be paid within 10 days after the Lender delivers to any Loan Party a certificate stating the amount of any Indemnified Taxes so paid or payable by the Lender and describing the basis for the indemnification claim.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

(e)    Treatment of Certain Refunds. If the Lender determines, in its Permitted Discretion, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.16 (including additional amounts paid pursuant to this Section 2.16), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of the Lender, shall repay to the Lender the amount paid to the Lender (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event the Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.  Notwithstanding anything to the contrary in this Section 2.16(e), in no event will the Lender be required to pay any amount to any indemnifying party pursuant to this Section 2.16 if such payment would place the Lender in a less favorable position (on a net after-Tax basis) than the Lender would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This Section 2.16(e) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

SECTION 2.17.  Payments Generally; Allocation of Proceeds.  (a)  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.14, 2.15 or 2.16, or otherwise) prior to 2:00 p.m., Chicago time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender at its offices at 10 South Dearborn Street, 22nd Floor, Chicago, Illinois.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)      Any proceeds of Collateral received by the Lender (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.10) or (C) amounts to be applied from the Collection Account (which shall be applied in accordance with Section 2.09(b), or (ii) after an Event of Default has occurred and is continuing and the Lender so elects such funds shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lender from any Loan Party, second, to pay interest due in respect of the Protective Advances, third, to pay the principal of the Protective Advances, fourth, to pay interest then due and payable on the Loans (other than the Protective Advances), fifth, to prepay principal on the Loans (other than the Protective Advances), sixth to pay or cash collateralize the Existing Obligations as provided in the Existing Loan Documents, seventh, to payment of any amounts owing with respect to Banking Services and Swap Obligations, and eighth, to the payment of any other Secured Obligation due to the Lender by any of the Loan Parties. The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

(c)      All payments of principal, interest, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees and expenses pursuant to Section 8.03), and other sums payable under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of the Borrower maintained with the Lender. The Borrower hereby irrevocably authorizes (i) the Lender to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (but such a Borrowing may only constitute a Protective Advance if made in accordance with Section 2.04), and (ii) the Lender to charge any deposit account of the Borrower maintained with the Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

SECTION 2.18.   Indemnity for Returned Payments.   If after receipt of any payment which is applied to the payment of all or any part of the Obligations, the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender. The provisions of this Section 2.18 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.18 shall survive the termination of this Agreement.

SECTION 2.19.   DIP and Bankruptcy Provisions.

(a)      General Representation.   The Borrower represents and warrants to the Lender that the Chapter 11 Case was commenced on the Petition Date in accordance with applicable law, and proper notice has been given for the Chapter 11 Case, for the hearings for the approval of the Interim Order and of the Final Order.

(b)      Security.

(i)      As adequate protection for its interest in the Existing Collateral (including Cash Collateral) and to secure the Existing Obligations, the Lender shall receive pursuant to sections 361, 363, and 364 of the Bankruptcy Code, replacement security interests in and liens upon all of the Collateral to the same extent, validity and perfection of the Lender's security interests in the Existing Collateral (the "Adequate Protection Replacement Liens").

(ii)      The Liens in the Collateral (the "Dip Liens") and the Adequate Protection Replacement Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements. Notwithstanding the foregoing, Debtor is authorized to execute such financing statements, instruments and notices as may be requested by Lender. The DIP Liens

shall constitute first priority security interests in and lien on all DIP Collateral subject in priority only to valid perfected, enforceable and non-avoidable liens in existences as of the Petition Date held by parties other than the Lender.  The Lender shall retain its prepetition lien on all Existing Collateral to secure the Existing Obligations, but as part of the DIP Facility, the Lender consents to being primed by the DIP Liens on account of its prepetition liens on the Existing Collateral.

(ii)     All of the Obligations shall constitute allowed administrative expense claims (the "Lender's Superpriority Administrative Claims") in the Chapter 11 Case with priority under Section 364(c) of the Bankruptcy Code over any and all other administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 726, 1113 and 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Borrower, any successor trustee(s) or any creditor in Borrower's Chapter 11 Case or subsequent bankruptcy case (except as Lender may expressly agree otherwise in any Transaction Document).

(iii)     The DIP Liens, the Adequate Protection Replacement Liens, and the Lender's Superpriority Administrative Expense Claims granted in favor of Lender in connection with the DIP Facility shall be subject to a carveout (the "Carveout") for (i) the payment of all U.S. Trustee fees that become due during the Chapter 11 Case, (iii) the payment of all fees and expenses incurred during the Chapter 11 Case in accordance with the approved Budget prior to the occurrence of an Event of Default, but that remain unpaid as of such date, of professionals retained by the Borrower, professionals retained by the official committee of unsecured creditors, once appointed (the "Committee") (collectively, the "Professional Fees") in an amount not to exceed (a) **[$50,000]** prior to entry of the Final Order and (b) **[$500,000]** following entry of the Final Order, and (iv) an amount up to **[$50,000]** for the payment of Professional Fees incurred from and after the occurrence of an Event of Default following entry of the Final Order ("Post-Default Professional Fees Carveout Limit").  So long as no Event of Default shall have occurred and be continuing, the Post-Default Professional Fees Carveout Limit shall not be reduced by the payment of Professional Fees in accordance with and subject to the approved Budget.  The Carveout shall not include any Professional Fees that are incurred in prosecuting a Challenge Action (as defined in the Interim Order) against the Lender or in hindering, delaying or otherwise attempting to prevent enforcement of its liens or realization upon its Existing Collateral or its DIP Collateral.

(c)     Validation of Existing Obligations and Existing Collateral.  As of September 2, 2014, the Borrower, on behalf of itself and its bankruptcy estate, and each other Loan Party agrees and acknowledges, effective upon the Final Order Date, that: (i) (a) a principal amount of $18,962,077.51 in Existing Obligations (consisting of $14,785,410.89 of principal under the "Revolving Loans", $2,636,666.62 of the "Term Loan" and $1,540,000 of "L/C Exposure") plus accrued interest and additional fees and expenses,  including the fees and expenses of legal counsel, was due and outstanding pursuant to the Prepetition Credit Agreement and the Existing Credit Documents; (ii) no Loan Party has any defense to, set-offs, counterclaims or other basis to challenge the Existing Obligations; (iii) the Existing Obligations are secured by valid perfected Liens on all of such Loan Party's Collateral; (iv) such Liens are not avoidable in any way, including pursuant to the avoidance provisions of the Bankruptcy Code; and (v) the Existing Obligations and such Liens are not subject to subordination in favor of any other Person on any basis.

(d)     Release.  Each Loan Party (other than the Borrower) hereby acknowledges that, effective upon the Final Order Date, such Loan Party has no defense, counterclaims, offsets, cross-complaints, claims or demands of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such Loan Party's liability to repay Lender as provided in this Agreement and/or the Guaranties or to seek affirmative relief or damages of any kind or nature from Lender.  Each of the Borrower, in its own right and on behalf of its bankruptcy estate, and each other Loan Party, and all of its successors, assigns, subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through it (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges Lender and all of Lender's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities,

Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including those arising under the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement and the transactions contemplated hereby, the Prepetition Credit Agreement, the Existing Credit Documents, the Loan Documents and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

(e)    Waiver of any Priming Rights.  On behalf of itself and its bankruptcy estate, and for so long as any of the Obligations shall be outstanding, the Borrower hereby irrevocably waives any right pursuant to 11 USC 364(c) or 364(d) or otherwise to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, other than the Carveout.

(f)    Orders.  On the date of the making of the initial Loan under this Agreement, the Interim Order will have been entered and shall be unstayed.  On the date of the making of any Loan, the Interim Order or the Final Order shall not be stayed, reversed, withdrawn or otherwise not in full effect.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to, or order by, the Court.

(g)    Bankruptcy Information.  Promptly after the same is available, the Borrower shall furnish or cause to be furnished to counsel for Lender all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower with the Court or the United States Trustee in the Chapter 11 Case or distributed by or on behalf of the Borrower to any official committee appointed in the Chapter 11 Case and, without limiting the generality of the foregoing, the Borrower shall promptly deliver to, and discuss with, Lender and its counsel any and all information and developments in connection with any proposed disposition of any of the Collateral, including any letters of intent, commitment letters or engagement letters received by the Borrower, and any other event or condition which is reasonably likely to have a material effect on the Borrower or the Chapter 11 Case, including the progress of any disclosure statement or any proposed Chapter 11 plan of reorganization.

(h)    Chapter 11 Claims.  Without limiting the provisions of Article VI, the Borrower shall not incur, create, assume, suffer, or permit any claim or Lien or encumbrance against it or any of its property or assets in the Chapter 11 Case (other than the claims, if any, specifically referred to in the Interim Order and Final Order, but only to the extent specifically therein described) to be *pari passu* with, senior to, or junior to the claims of Lender against the Borrower in respect to the Obligations, or apply to the Court for authority to do so.

(i)    Remedies of Lender.  Neither the Borrower nor any other Loan Party shall seek to obtain any stay on the exercise of the remedies available to Lender under this Agreement or the other Loan Documents.

(j)    Prepetition Indebtedness.  Neither the Borrower nor any other Loan Party shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (i) the Interim Order or the Final Order or (ii) any Prepetition Indebtedness.  Neither the Borrower nor any other Loan Party shall make any payment in respect of, or repurchase, redeem, retire or defease any Prepetition Indebtedness, without order of the Court.

(k)    _Parties Including Trustees; Court Proceedings._    This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender, and the assigns, transferees, and endorsees of Lender.  The Liens created in the Security Documents and other Loan Documents shall be and remain valid and perfected, and the claims of Lender hereunder valid and enforceable in accordance with the terms hereof, notwithstanding the discharge of the Borrower pursuant to 11 U.S.C. § 1141, the conversion of the Chapter 11 Case to a Chapter 7 Case or any other bankruptcy case of the Borrower, the dismissal of the Chapter 11 Case or any subsequent Chapter 7 Case or the release of any of the Collateral from the property of the Borrower.  The Liens created in the Security Documents and the other Loan Documents shall be and remain valid and perfected without the necessity that Lender file financing statements, mortgages, or deeds of trust or otherwise perfect its Lien under applicable law.  This Agreement, the claims of Lender hereunder, and all Liens created pursuant to the Security Agreements or any other Loan Document shall at all times be binding upon such of the Loan Parties as are parties thereto, the Borrower's or any other Loan Party's bankruptcy estate and any trustee appointed in any Chapter 11 Case or any Chapter 7 Case, or any other successor in interest to such Loan Party.  This Agreement shall not be subject to Section 365 of the Bankruptcy Code.

(l)    _Application of Payments_.  Unless otherwise specifically provided for in this Agreement, all payments under this Agreement and proceeds of any of the Collateral shall be applied to reduce the Loans and the Existing Obligations made hereunder in such order and manner as the Lender shall determine, in its sole and absolute discretion.

ARTICLE III

Representations and Warranties

Each Loan Party represents and warrants to the Lender that:

SECTION 3.01.  _Organization; Powers._  Each Loan Party and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.  _Authorization; Enforceability._  The Transactions are within each Loan Party's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  The Loan Documents to which each Loan Party is a party have been duly executed and delivered by such Loan Party and constitute a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.  _Governmental Approvals; No Conflicts._  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any Requirement of Law applicable to any Loan Party or any of its Subsidiaries, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any of its Subsidiaries or the assets of any Loan Party or any of its Subsidiaries, or give rise to a right thereunder to require any payment to be made by any Loan Party or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any of its Subsidiaries, except Liens created pursuant to the Loan Documents.

SECTION 3.04.  _Budget._  Each Budget and its accompanying notes fairly present the condition of the Borrower as of the date thereof and the projected cash flow of the Borrower for the periods set forth therein.  There has been no material adverse change in the condition or operation, financial or otherwise, of the Borrower since the date of the Budget, and none of the Debtors has any direct or contingent liabilities which are not disclosed in the Budget or the notes thereto.

SECTION 3.05.  Properties.  (a)  As of the date of this Agreement, Schedule 3.05 sets forth the address of each parcel of real property that is owned or leased by each Loan Party.  Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each of the Loan Parties and its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)     Each Loan Party and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 3.05, and the use thereof by each Loan Party and its Subsidiaries does not infringe in any material respect upon the rights of any other Person, and each Loan Party's rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06.  Litigation and Environmental Matters.  (a) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b)     Except for the Disclosed Matters (i) no Loan Party nor any of its Subsidiaries has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party nor any of its Subsidiaries (1) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law or (2) has become subject to any Environmental Liability.

(c)     Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.  Compliance with Laws and Agreements.  Each Loan Party and its Subsidiaries is in compliance with all Requirements of Law applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08.  Investment Company Status.  No Loan Party nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.  Taxes.  Each Loan Party and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves.  No tax liens have been filed and no claims are being asserted with respect to any such taxes.

SECTION 3.10.  ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $10,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $10,000 the fair market value of the assets of all such underfunded Plans.

SECTION 3.11.  <u>Disclosure.</u>  The Borrower, Kilbourn and Holdings have disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Lender or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that, with respect to projected financial information, each of the Borrower, Kilbourn and Holdings represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

SECTION 3.12.  <u>Material Agreements.</u>  All material agreements and contracts to which any Loan Party is a party or is bound as of the date of this Agreement are listed on <u>Schedule 3.12</u>.  No Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any material agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13.  <u>Solvency.</u>  (a) Immediately after the consummation of the Transactions to occur on the Effective Date, (i) the fair value of the assets of each Loan Party other than Borrower, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of each Loan Party other than Borrower will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party other than Borrower will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (iv) no Loan Party other than Borrower will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Effective Date.

(b)  No Loan Party other than Borrower intends to, or will permit any of its Subsidiaries to, and believes that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.14.  <u>Insurance.</u>  <u>Schedule 3.14</u> sets forth a description of all insurance maintained by or on behalf of the Loan Parties and the Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums in respect of such insurance have been paid.  The Borrower believes that the insurance maintained by or on behalf of Borrower and its Subsidiaries is adequate.

SECTION 3.15.  <u>Capitalization and Subsidiaries.</u>  <u>Schedule 3.15</u> sets forth (a) a correct and complete list of the name and relationship to the Borrower of each Subsidiary of the Borrower, (b) a true and complete listing of each class of each of the Borrower's authorized Equity Interests, of which all of such issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on <u>Schedule 3.15</u>, and (c) the type of entity of Holdings and each of its Subsidiaries.  All of the issued and outstanding Equity Interests owned by any Loan Party has been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and is fully paid and non-assessable

SECTION 3.16.  <u>Security Interest in Collateral.</u>  The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Lender, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Secured Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Lender pursuant to any applicable law or agreement and (b) Liens perfected only by possession (including possession of any certificate of title) to the extent the Lender has not obtained or does not maintain possession of such Collateral.

31

SECTION 3.17. <u>Employment Matters</u>.  As of the Effective Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary pending or, to the knowledge of the Borrower, threatened. The hours worked by and payments made to employees of the Loan Parties and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Loan Party or such Subsidiary.

SECTION 3.18. <u>Affiliate Transactions</u>.  Except as set forth on <u>Schedule 3.18</u>, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own stock in (but not exceeding 2.0% of the outstanding Equity Interests of)) any publicly traded company that may compete with a Loan Party.

SECTION 3.19. <u>Common Enterprise</u>.  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lender to the Borrower hereunder, both in their separate capacities and as members of the group of companies.  Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

ARTICLE IV

<u>Conditions</u>

SECTION 4.01.  <u>Effective Date</u>.  The obligations of the Lender to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)    <u>Credit Agreement and Loan Documents</u>.  The Lender (or its counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) duly executed copies of the Loan Documents and such other certificates, documents, instruments and agreements as the Lender shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including a written opinion of the Loan Parties' counsel, addressed to the Lender in form and substance satisfactory to Lender (together with any other real estate related opinions separately described herein).

(b)    <u>Budget</u>.  The Lender shall have received the initial Budget in form and substance satisfactory to Lender.

(c)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Lender shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its Member, Manager or other authorized officer, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the Financial

Officers and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(d)     Advisors.  The Borrower shall have engaged financial consultants, restructuring advisors and/or other advisors, reasonably acceptable to Lender for a scope of services reasonably acceptable to Lender.  Lender acknowledges that Borrower's retention of Silverman Consulting is acceptable to Lender and satisfies this condition precedent.

(e)     [Reserved].

(f)     Lien Searches.  The Lender shall have received the results of a recent lien search in each of the jurisdictions where assets of the Loan Parties are located, and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Effective Date pursuant to a pay-off letter or other documentation satisfactory to the Lender.

(g)     Reserved.

(h)     Funding Account(s).  The Lender shall have received a notice setting forth the deposit account of the Borrower (the "Funding Account") to which the Lender is authorized by the Borrower to transfer the proceeds of any Borrowing requested or authorized pursuant to this Agreement.

(i)     Customer List.  The Lender shall have received a true and complete customer list for the Borrower and its Subsidiaries, which list shall state the customer's name, mailing address and phone number and shall be certified as true and correct in all material respects by a Financial Officer of the Borrower.

(j)     Collateral Access and Control Agreements.   The Lender shall have received each Collateral Access Agreement required to be provided pursuant to Section 4.13 of the Security Agreement, or Lender has established a Reserve with respect thereto.

(k)     [Reserved].

(l)     Borrowing Base Certificate.  The Lender shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the Business Day immediately preceding the Effective Date.

(m)     Availability.  The Lender shall have received evidence that Availability is greater than Zero Dollars ($0) after giving effect to the initial Revolving Loan advance hereunder as reflected on the Borrowing Base Certificate delivered pursuant to clause (l) above.

(n)     Security Agreement/Pledge Agreement.  The Lender shall have received the duly executed Security Agreement from the Loan Parties and an amendment to the Kilbourn Membership Pledge Agreement from each of Lawrence Greenspon and Dennis Greenspon, each in form and substance satisfactory to Lender.

(o)     Pledged Stock; Stock Powers; Pledged Notes.  The Lender shall have received (i) the certificates representing the Equity Interests pledged pursuant to the Security Agreement and the Kilbourn Membership Pledge Agreement, as amended, together with an undated membership powers for each such certificate executed in blank by a duly authorized officer or manager of the pledgor thereof and (ii) each promissory note (if any) pledged to the Lender pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(p)  <u>Reaffirmation of Subordination Agreements</u>. The Lender shall have received a duly executed reaffirmation of subordination agreement from each holder of Subordinated Indebtedness, each in form and substance satisfactory to Lender.

(q)  <u>Filings, Registrations and Recordings</u>.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(r)  <u>Reserved</u>.

(s)  <u>Mortgages, etc</u>.  The Lender shall have received from Kilbourn with respect to the Mortgage previously executed by Kilbourn in favor of Lender as security for the Existing Obligations, each of the following, in form and substance reasonably satisfactory to the Lender:

(i)  the First Amendment to Mortgage;

(ii)  evidence that a counterpart of the First Amendment to Mortgage has been recorded with the Cook County Recorder's Office;

(iii)  a preliminary date down endorsement to the existing title policy issued to Lender insuring the Mortgage, with an effective date satisfactory to Lender, reflecting no new exceptions to title (other than those approved by Lender in writing);

(iv)  such other information, documentation, and certifications as may be reasonably required by the Lender.

(t)  <u>Insurance</u>.  The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.09 and Section 4.12 of the Security Agreement.

(u)  [Reserved].

(v)  <u>Tax Withholding</u>.  The Lender shall have received a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party.

(w)  <u>Corporate Structure</u>.  The corporate structure, capital structure and other material debt instruments, material accounts and governing documents of the Loan Parties and their Affiliates shall be acceptable to the Lender in its sole discretion.

(x)  <u>Reserved</u>.

(y)  <u>Legal Due Diligence</u>. The Lender and its counsel shall have completed all legal due diligence, the results of which shall be satisfactory to Lender in its sole discretion.

(z)  <u>Reserved</u>.

(aa)  The Interm Order shall have been entered by the Bankruptcy Court within three Business Days following the Petitions date and shall not have been reversed, vacated, modified, amended or stayed except for modifications and amendments reasonably acceptable to Lender.

(bb)  Borrower shall have implemented a cash management system satisfactory to Lender, which shall include, among other things, exclusive collection and other remittance procedures (without netting or

offsets) and lockbox collection procedures. The existing cash management system if maintained following the Petition Date is acceptable to Lender.

      (cc)    <u>Other Documents</u>. The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested.

The Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lender to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 2:00 p.m., Chicago time, on _____, 2014 (and, in the event such conditions are not so satisfied or waived, the Commitment shall terminate at such time).

      SECTION 4.02.  <u>Each Credit Event.</u>  The obligation of the Lender to make a Loan on the occasion of any Borrowing, and to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

      (a)    The representations and warranties of the Loan Parties set forth in this Agreement shall be true and correct with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date.

      (b)    At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

      (c)    Lender shall have received the most recent Budget required hereby, including a variance analysis with respect to the Borrower's actual results, and revised "to date" projections and cash flows report in form and substance acceptable to Lender.

      (d)    After giving effect to any Borrowing, Availability is not less than zero.

Each Borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Loan Parties on the date thereof as to the matters specified in paragraphs (a), (b) and (c) of this Section.

ARTICLE V

<u>Affirmative Covenants</u>

      Until the Commitment has expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

      SECTION 5.01.  <u>Financial Statements; Borrowing Base and Other Information.</u>  The Borrower will furnish to the Lender:

      (a)    within 120 days after the end of each fiscal year of Borrower, its audited consolidated and consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

      (b)    within 30 days after the end of each fiscal month of the Borrower, its consolidated and consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of

the end of and for such fiscal month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)       concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower in substantially the form of <u>Exhibit B</u>  (i) certifying that such financial statements present fairly in all material respects the financial condition and results of operations of (A) Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied with respect to financial statements delivered under clause (a) above, or (B) the Borrower and its consolidated Subsidiaries  on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, with respect to financial statements delivered under clause (b) above, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)       on the second Business Day of each week, an update of the Budget, including a variance analysis with respect to the Borrower's actual results, and revised "to date" projections and cash flows report in form and substance acceptable to Lender.  Such updates shall include forecasts of revenues and receipts, expenses (including restructuring expenses and expenses arising on account of the Chapter 11 Case including Professional Fees), statements of cash flows and applicable assumptions and shall be prepared by a Financial Officer and/or financial advisors of the Borrower and certified by such persons as being prepared in good faith and fairly presenting in all material respects the information set forth therein. Upon approval by Lender of such weekly updates, such updates shall become the Budget;

(e)       as soon as available, but in any event no later than the end of, and no earlier than thirty (30) days prior to the end of each fiscal year of Borrowers, a copy of the plan and forecast (including a projected consolidated and consolidating balance sheet, income statement and funds flow statement) of the Borrowers for each month of such fiscal year (the "<u>Projections</u>") in form reasonably satisfactory to the Lender;

(f)       on each Business Day, and at such other times as may be requested by the Lender, as of the end of the immediately preceding Business Day, a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Lender may reasonably request;

(g)       as soon as available but in any event within 20 days of the end of each calendar month and at such other times as may be requested by the Lender, as of the period then ended, all delivered electronically in a text formatted file acceptable to the Lender:

(i)       a detailed aging of the Borrower's Accounts including all invoices aged by invoice date and due date (with an explanation of the terms offered) prepared in a manner reasonably acceptable to the Lender, together with a summary specifying the name, address, and balance due for each Account Debtor;

(ii)       a schedule detailing the Borrower's Inventory, in form satisfactory to the Lender, (1) by location (showing Inventory in transit, any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for

36

Reserves as the Lender has previously indicated to the Borrower are deemed by the Lender to be appropriate, and (2) including a report of any variances or other results of Inventory counts performed by the Borrower since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by Borrowers and complaints and claims made against the Borrower);

(iii)    a worksheet of calculations prepared by the Borrower to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion;

(iv)    a reconciliation of the Borrower's Accounts and Inventory between (A) the amounts shown in the Borrower's general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above, and (B) the amounts and dates shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (f) above as of such date; and

(v)    a reconciliation of the loan balance per the Borrower's general ledger to the loan balance under this Agreement;

(h)    as soon as available but in any event within 20 days of the end of each calendar month and at such other times as may be requested by the Lender, as of the month then ended, a schedule and aging of the Borrower's accounts payable, delivered electronically in a text formatted file acceptable to the Lender;

(i)    promptly upon the Lender's request:

(i)    copies of invoices in connection with the invoices issued by the Borrower in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)    copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and

(iii)    a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(j)    contemporaneously with the Borrower's delivery to Lender of each Borrowing Base Certificate, and at such other times as may be requested by Lender, as of the period then ended, the Borrower's sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(k)    as soon as possible and in any event within 30 days of filing thereof, copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(l)    promptly upon Lender's request, an updated customer list for the Borrower and its Subsidiaries, which list shall state the customer's name, mailing address and phone number and shall be certified as true and correct in all material respects by a Manager, Member or other Authorized Officer of the Borrower;

(m)    as soon as possible and in any event within ten days after the end of each calendar month, a detailed listing of all advances of proceeds of Loans requested by the Borrower during the immediately preceding calendar month and a detailed listing of all intercompany loans made by the Borrowers during such calendar month;

(n)    reserved;

(o)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by any Borrower to its members generally, as the case may be; and

(p)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Lender may reasonably request.

SECTION 5.02.  Notices of Material Events.  The Borrowers will furnish to the Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a)    the occurrence of any Default;

(b)    receipt of any notice of any governmental investigation or any litigation commenced or threatened against any Loan Party that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws; (vi) contests any tax, fee, assessment, or other governmental charge in excess of $100,000, or (vii) involves any product recall;

(c)    any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)    any loss, damage, or destruction to the Collateral in the amount of $100,000 or more, whether or not covered by insurance;

(e)    within two Business Days of receipt thereof, any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located;

(f)    all material amendments to the Borrower's lease with RLD Investments, LLC, together with a copy of each such amendment;

(g)    within two Business Days after the occurrence thereof, any Loan Party entering into a Swap Agreement or an amendment thereto, together with copies of all agreements evidencing such Swap Agreement or amendment;

(h)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrowers and its Subsidiaries in an aggregate amount exceeding $100,000; and

(i)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  Existence; Conduct of Business.  Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 and (b) carry on and

conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04.  <u>Payment of Obligations.</u>  Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP; <u>provided</u>, <u>however</u>, each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05.  <u>Maintenance of Properties.</u>  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06.  <u>Books and Records; Inspection Rights.</u>  Each Loan Party will, and will cause each Subsidiary to, (i) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives designated by the Lender (including employees of the Lender, or any consultants, accountants, lawyers and appraisers retained by the Lender, upon reasonable prior notice), to visit and inspect its properties, to conduct at the Loan Party's premises, field examinations of the Loan Party's assets, liabilities, book and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  The Loan Parties acknowledge that the Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the Lender.

SECTION 5.07.  <u>Compliance with Laws.</u>  Each Loan Party will, and will cause each Subsidiary to, comply with all Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.  <u>Use of Proceeds and Letters of Credit.</u>  The proceeds of the Loans will be used only to fund operating expenses, the costs and expenses of administering the Chapter 11 Case and provide working capital to the Borrower consistent with the Budget as approved by Lender and not prohibited by this Agreement or any of the Orders.  No part of the proceeds of any Loan will be used, whether directly or indirectly, (i) for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X or (ii) other than as approved in the Budget.

SECTION 5.09.  <u>Insurance</u> .  Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including (i) loss or damage by fire and loss in transit; (ii) theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; (iii) business interruption; (iv) general liability and (v) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations) and (b) all insurance required pursuant to the Collateral Documents.  The Borrowers will furnish to the Lender, information in reasonable detail as to the insurance so maintained.

SECTION 5.10.  <u>Casualty and Condemnation.</u>  The Borrowers will (a) furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.11.  <u>Appraisals.</u>  At any time that the Lender requests, the Borrowers will, and will cause each Subsidiary to, provide the Lender with appraisals or updates thereof of their Inventory and real property

from an appraiser selected and engaged by the Lender, and prepared on a basis satisfactory to the Lender, such appraisals and updates to include, without limitation, information required by applicable law and regulations.

SECTION 5.12. <u>Depository Banks</u>.  Holdings, Kilbourn, the Borrower and their Subsidiaries will maintain the Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of its business.

SECTION 5.13. <u>Additional Collateral; Further Assurances</u>. (a) Subject to applicable law, the Borrower and each Subsidiary that is a Loan Party shall, unless the Lender otherwise consents, cause each of its domestic Subsidiaries formed or acquired after the date of this Agreement in accordance with the terms of this Agreement to become a Loan Party by executing a Joinder Agreement.  Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Lender, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b)     Each Borrower and each Subsidiary that is a Loan Party will cause (i) 100% of the issued and outstanding Equity Interests of each of its domestic Subsidiaries and (ii) 65% (or such greater percentage that, due to a change in applicable law after the date hereof, (1) could not reasonably be expected to cause the undistributed earnings of such foreign Subsidiary as determined for U.S. federal income tax purposes to be treated as a deemed dividend to such foreign Subsidiary's U.S. parent and (2) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each foreign Subsidiary directly owned by each Borrower or any domestic Subsidiary to be subject at all times to a first priority, perfected Lien in favor of the Lender pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request.

(c)     Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by law or which the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all at the expense of the Loan Parties.  Notwithstanding the foregoing, at any time after an Event of Default has occurred, each Loan Party will, upon the request of the Lender, cause each foreign Subsidiary to become a Loan Party and a Loan Guarantor and to grant Liens to the Lender on its assets and have the balance of its Equity Interests pledged to the Lender.

(d)     If any material assets (including any real property or improvements thereto or any interest therein) are acquired by the Borrower or any Subsidiary that is a Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien in favor of the Security Agreement upon acquisition thereof), the Borrower will (i) notify the Lender, and, if requested by the Lender, cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each Subsidiary that is a Loan Party to take, such actions as shall be necessary or reasonably requested by the Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.14. <u>363 Sale</u>.  The Borrower shall solicit offers to purchase substantially all of its assets (and certain non-debtor's assets, but not including the real estate owned by Kilbourn and mortgaged to Lender) calling for the payment of a cash purchase price that is at least sufficient to pay in full all of the Existing Obligations and the Obligations, together with all other fees and expenses due to Lender, with a closing on such purchase to occur no later than December 31, 2014, with such sale to be free and clear of all Liens of U.S. Customs (such sale, a "<u>Qualifying Sale</u>").  In respect to the foregoing, the Borrower shall (a) by no later than September 24,

2014, receive a non-binding letter of intent for a Qualifying Sale; (b) by no later than October 10, 2014, enter into an Asset Purchase Agreement with a prospective purchaser for a Qualifying Sale; and (c) by no later than October 17, 2014, file with the Bankruptcy Court all necessary motions to approve a Qualifying Sale.

ARTICLE VI

Negative Covenants

Until the Commitment has expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document have been paid in full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 6.01.  Indebtedness.  No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)    the Secured Obligations;

(b)    Indebtedness existing on the date hereof and set forth in Schedule 6.01 and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)    Indebtedness of any Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to any Borrower or any Subsidiary that is a Loan Party shall be subject to Section 6.04 and (ii) Indebtedness of any Borrower to any Subsidiary and Indebtedness of any Subsidiary that is a  Loan Party to any Subsidiary that is not a Loan Party shall be subordinated to the Secured Obligations on terms reasonably satisfactory to the Lender;

(d)    Guarantees by any Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of any Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by any Borrower or any Subsidiary that is a Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations of the applicable Subsidiary on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)    Indebtedness of any Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof; provided that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (e) shall not exceed [$_____] at any time outstanding;

(f)    Indebtedness which represents an extension, refinancing, or renewal (such Indebtedness being referred to herein as the "Refinancing Indebtedness") of any of the Indebtedness described in clauses (b) and (e) hereof (such Indebtedness being so extended, refinanced or renewed being referred to herein as the "Refinanced Indebtedness"); provided that, (i) such Refinancing Indebtedness does not increase the principal amount or interest rate of the Refinanced Indebtedness, (ii) any Liens securing such Refinancing Indebtedness are not extended to any additional property of any Loan Party, (iii) no Loan Party that is not originally obligated with respect to repayment of such Refinanced Indebtedness is required to become obligated with respect to such Refinancing Indebtedness, (iv) such Refinancing Indebtedness does not result in a shortening of the average weighted maturity of such Refinanced Indebtedness, (v) the terms of such Refinancing Indebtedness are not less favorable to the obligor thereunder than the original terms of such Refinanced Indebtedness and (vi) if such Refinanced Indebtedness was subordinated in right of

payment to the Secured Obligations, then the terms and conditions of such Refinancing Indebtedness must include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to such Refinanced Indebtedness;

(g)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business; and

(h)    Indebtedness of any Borrower or any Subsidiary in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business.

SECTION 6.02.  Liens.  No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)    Liens created pursuant to any Loan Document;

(b)    Permitted Encumbrances;

(c)    any Lien on any property or asset of any Borrower or any Subsidiary existing on the date hereof and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of such Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(d)    Liens on fixed or capital assets acquired, constructed or improved by any Borrower or any Subsidiary; provided that (i) such security interests secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such security interests shall not apply to any other property or assets of such Borrower or Subsidiary or any other Borrower or such Subsidiary;

(e)    any Lien existing on any property or asset (other than Accounts and Inventory) prior to the acquisition thereof by any Borrower or any Subsidiary or existing on any property or asset (other than Accounts and Inventory) of any Person that becomes a Loan Party after the date hereof prior to the time such Person becomes a Loan Party; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Loan Party, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Loan Party and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Loan Party, as the case may be and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(f) Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon;

(g)    Liens arising out of sale and leaseback transactions permitted by Section 6.06; and

(h)    Liens granted by a Subsidiary that is not a Loan Party in favor of any Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted

Encumbrance and clause (a) above and (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrance and clause (a) above.

SECTION 6.03.  Fundamental Changes.  (a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing any Subsidiary of any Borrower may merge into a Borrower in a transaction in which such Borrower is the surviving entity; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)      No Loan Party will, nor will it permit any Subsidiary to, engage in any business other than businesses of the type conducted by the Borrowers and their Subsidiaries on the date hereof, businesses reasonably related thereto and investments permitted pursuant to Section 6.04.

(c)      Holdings will not engage in any business or activity other than the ownership of all the outstanding Equity Interests of the Borrower and activities incidental thereto.  Holdings will not own or acquire any assets (other than Equity Interests of the Borrower and the cash proceeds of any Restricted Payments permitted by Section 6.08) or incur any liabilities (other than liabilities under the Loan Documents and liabilities reasonably incurred in connection with its maintenance of its existence).

SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any Subsidiary to, form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of indebtedness or Equity Interests of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)      Permitted Investments, subject to control agreements in favor of the Lender or otherwise subject to a perfected security interest in favor of the Lender;

(b)      investments in existence on the date of hereof and described in Schedule 6.04;

(c)      investments by Holdings in the Borrower and by the Borrower and the Subsidiaries in Equity Interests in their respective Subsidiaries that are Loan Parties, provided that any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement (subject to the limitations applicable to common stock of a Foreign Subsidiary referred to in Section 5.13);

(d)      loans or advances made by the Borrower to any Subsidiary and made by any Subsidiary to any other Borrower or any other Subsidiary that is a Loan Party, provided that any such loans and advances made by a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement;

(e)      Guarantees of a Loan Party's Indebtedness permitted by Section 6.01;

(f)      loans or advances made by a Loan Party to its employees on an arms-length basis in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes up to a maximum of $10,000 to any employee and up to a maximum of $50,000 in the aggregate at any one time outstanding;

(g)      subject to Sections 4.2(a) and 4.4 of the Security Agreement, notes payable, or stock or other securities issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(h)    [reserved];

(i)    [reserved];

(j)    investments received in connection with the dispositions of assets permitted by Section 6.05;

(k)    [reserved]; and

(l)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances."

SECTION 6.05.    Asset Sales.    No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will any Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to another Borrower or another Subsidiary in compliance with Section 6.04), except:

(a)    sales, transfers and dispositions of (i) inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus equipment or property in the ordinary course of business;

(b)    sales, transfers and dispositions of assets to any Borrower or any Subsidiary, provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)    sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof;

(d)    sales, transfers and dispositions of Permitted Investments and other investments permitted by clauses (i) and (k) of Section 6.04;

(e)    sale and leaseback transactions permitted by Section 6.06;

(f)    dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Borrower or any Subsidiary;

(g)    sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other paragraph of this Section, provided that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this paragraph (g) shall not exceed $10,000 during any fiscal year of the Borrowers;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for at least 75% cash consideration; and

(h)    a Qualifying Sale approved by the Bankruptcy Court.

SECTION 6.06.    Sale and Leaseback Transactions.    No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

SECTION 6.07.    Swap Agreements.    No Loan Party will, nor will it permit any  Subsidiary to, enter into any Swap Agreement.

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness.  (a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) each of Holdings and each Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional non-cash Equity Interests, and (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

(b)      No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)      payment of Indebtedness created under the Loan Documents;

(ii)      payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)      refinancings of Indebtedness to the extent permitted by Section 6.01; and

(iv)      payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness.

SECTION 6.09.  Transactions with Affiliates.  No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among any Borrower and any Subsidiary that is a Loan Party not involving any other Affiliate, (c) any investment permitted by Sections 6.04(c) or 6.04(d), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) loans or advances to employees permitted under Section 6.04, (g) the payment of reasonable fees to directors of any Borrower or any Subsidiary who are not employees of such Borrower or Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrowers or their Subsidiaries in the ordinary course of business and (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by a Borrower's board of directors.

SECTION 6.10.  Restrictive Agreements.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests or to make or repay loans or advances to any Borrower or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof.

SECTION 6.11. <u>Amendment of Material Documents.</u>  No Loan Party will, nor will it permit any Subsidiary to, (a)  change its state of formation or its organizational form, or (b) amend, modify or waive any of its rights under (i) any agreement relating to any Subordinated Indebtedness, or (ii) its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents, unless, in each case, such amendment, modification or waiver could not have a Material Adverse Effect.

SECTION 6.12. <u>Financial Covenants.</u>

(a)  <u>Budget Variance</u>.  For any period in question, with respect to the then approved Budget, (i) actual amounts for expense line items shall not exceed 115% of the amount projected for such expense for any weekly period then ended or 115% of the amount projected for such expense on a cumulative basis for that portion of the Budget period then ended and (ii) the Borrower's actual sales and cash receipts shall be no less than 90% of the respective amounts projected for sales and receipts for any weekly period then ended or less than 90% of the respective amounts for sales and receipts on a cumulative basis for that portion of the Budget period then ended.

(b)  <u>EBITDA</u>.  As of the last day of any month beginning September 30, 2014, the Borrower's EBITDA shall not be less than 85% of Borrower's EBITDA projected on a cumulative basis for that portion of the Budget period then ended.

SECTION 6.13 Management.  Without the prior written consent of the Lender which consent shall not be unreasonably withheld or delayed, the Borrower shall not engage any management company to manage all or any portion of the operations of the Borrower's business.

ARTICLE VII

Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable;

(c)  any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)  any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in (i) Section 5.03 (with respect to a Loan Party's existence) which is not cured within ten (10) days (provided such ten (10) day cure period shall not be available if a material adverse event has occurred within such ten (10) day period with respect thereto), (ii) Section 5.08 or Section 5.14 or (iii) Article VI;

(e)  any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of (i) 5 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of Section 5.01, 5.02, 5.03 through 5.07, 5.09, 5.10 or 5.12 of this Agreement or (ii) 15 days

after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement;

      (f)      any Loan Party or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

      (g)      any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

      (h)      except for the Chapter 11 Case, an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or any Subsidiary of any Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Subsidiary of any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

      (i)      except for the Chapter 11 Case, any Loan Party or any Subsidiary of any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary of any Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

      (j)      except for the Chapter 11 Case, any Loan Party or any Subsidiary of any Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

      (k)      (i) one or more judgments for the payment of money in an aggregate amount in excess of $100,000 shall be rendered against any Loan Party, any Subsidiary of any Loan Party or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Subsidiary of any Loan Party to enforce any such judgment; or (ii) any Loan Party or any Subsidiary of any Loan Party shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

      (l)      an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrowers and their Subsidiaries in an aggregate amount exceeding $10,000 in any year;

      (m)      a Change in Control shall occur;

(n)        the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(o)        the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect;

(p)        except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien;

(q)        any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r)        any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); or

(s)        any Loan Party is criminally indicted or convicted under any law that may reasonably be expected to lead to a forfeiture of any Collateral;

(t)        any "Event of Default" (as defined therein) shall occur under or within the meaning of the Prepetition Credit Agreement other than an Event of Default thereunder caused by the Chapter 11 Case or any other "Events of Default" under the Prepetition Credit Agreement that have been specifically identified by Lender pursuant to a written default letter issued to one or more Loan Parties; provided, however, Lender agrees that the financial covenants set forth in Section 6.12 of the Prepetition Credit Agreement shall not be tested from and after the period ending August 31, 2014; or

(u)        Certain bankruptcy events:

(i)        the Final Order is not entered within 25 days following the entry of the Interim Order;

(ii)        the Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(iii)        appointment in the Chapter 11 Case of a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(iv)        entry of an order amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying the DIP Facility, the Orders, the Term Sheet or this Agreement without the prior written consent of Lender;

(v)        entry of an order permitting any claim against, or obligation of, the Borrower (now existing or hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the priority of Lender in respect of either the Existing Obligations or the Obligations;

(vi)        any attempt by the Borrower or any other Loan Party to invalidate, reduce or otherwise impair any of Lender's rights, claims or liens under the DIP Facility, the Term Sheet, this

Agreement and the Orders or to invalidate, reduce or otherwise impair any of Lender's rights, claims or liens under the Existing Credit Documents and the Orders, or any such rights, claims or liens shall, for any reason, cease to be valid.

(vii)    the entry of an order which subject any of Lender's  Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code; or

(viii)    any Loan Party shall fail to comply with the terms and conditions of the Orders;

then, and in every such event (other than an event with respect to the Borrower described in clause (h), (i) or (u) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrower, take either or both of the following actions, at the same or different times:   (i)  terminate the Commitment, whereupon the Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (h), (i) or (u) of this Article, the Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.   Upon the occurrence and the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII

Miscellaneous

SECTION 8.01.  Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)    if to any Loan Party, to the Borrower at:

c/o LDR Industries, LLC
600 N. Kilbourn Avenue
Chicago, Illinois 60624
Attention: Dennis Greenspon
Facsimile No:  (773) 265-3160

With a copy to:

Reed Smith
10 S. Wacker Drive, 40th Floor
Chicago, Illinois 60606
Attention: Austin L. Hirsch, Esq.
Facsimile No.: (312) 207-6400

(ii)    if to the Lender, to JPMorgan Chase Bank, N.A. at:

JPMorgan Chase Bank, N.A.
IL1-1458

10 S. Dearborn, Floor 22
Chicago, Illinois 60603
Attention: Ms. Lynne M. Ciaccia
Facsimile No: (312) 732-7593

With a copy to:

Thompson Coburn LLP
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
Attention: Victor A. DesLaurier, Esq.
Facsimile No.: (312) 782-1746

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received or (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(b)　　Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Event of Default certificates delivered pursuant to Section 5.01(d) unless otherwise agreed by the Lender.  The Lender or the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)　　Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02.  Waivers; Amendments.  (a)  No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)　　Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Lender, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.   Expenses; Indemnity; Damage Waiver.   (a)   The Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during  any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. Expenses being reimbursed by the Borrowers under this Section include, without limiting the generality of the foregoing, costs and expenses incurred in connection with:

(i)     appraisals (subject to the limitation set forth in Section 5.11) and insurance reviews;

(ii)     field examinations and the preparation of Reports based on the fees charged by a third party retained by the Lender or the internally allocated fees for each Person employed by the Lender with respect to each field examination; provided, however, if no Event of Default exists hereunder, Borrowers shall not be responsible for the costs and expenses incurred in connection with more than two field examinations each fiscal year;

(iii)     taxes, fees and other charges for (A) lien and title searches and title insurance and (B) recording the Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Lender's Liens;

(iv)     sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(v)     forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing costs and expenses may be charged to the Borrower as Revolving Loans or to another deposit account, all as described in Section 2.17(c).

(b)     The Borrower shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the reasonable out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Borrower or any of their Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of their Subsidiaries, (iv) the failure of the Borrowers to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by the Borrowers for Taxes pursuant to Section 2.16, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available with respect to any exemplary or punitive damages, or to the extent that such losses,

claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of such Indemnitee. This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    The relationship between any Loan Party on the one hand and the Lender on the other hand shall be solely that of debtor and creditor. The Lender (i) shall not have any fiduciary responsibilities to any Loan Party or (ii) does not undertake any responsibility to any Loan Party to review or inform such Loan Party of any matter in connection with any phase of any Loan Party's business or operations. To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(d)    All amounts due under this Section shall be payable not later than 5 days after written demand therefor.

SECTION 8.04. Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that, except in the case of an assignment to an Affiliate of the Lender or an Approved Fund, the Borrowers must give their prior written consent to such assignment (which consent shall not be unreasonably withheld); and provided further that any consent of the Borrowers otherwise required under this paragraph shall not be required if an Event of Default has occurred and is continuing. Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the Lender under this Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of the Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.15, 2.16 and 8.03). The Borrowers hereby agree to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple lenders and an administrative agent to act on behalf of such lenders. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

For the purposes of this Section 8.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) the Lender, (b) an Affiliate of the Lender or (c) an entity or an Affiliate of an entity that administers or manages the Lender.

(c)    The Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities (a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers shall continue to deal solely and

directly with the Lender in connection with the Lender's rights and obligations under this Agreement.   Subject to paragraph (d) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.14, 2.15 and 2.16 to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 2.17 and 2.18 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.14 or 2.16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.17(c) as though it were a Lender.

(d)       The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including any pledge or assignment to secure obligations to a Federal Reserve Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

SECTION 8.05.   Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments  delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender, the Lender or any Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitment has not expired or terminated.  The provisions of Sections 2.14, 2.15, 2.16 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitment or the termination of this Agreement or any provision hereof.

SECTION 8.06.   Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 8.07.   Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08.   Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the

account of the Borrowers or such Loan Guarantor against any of and all the Secured Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 8.09.  <u>Governing Law; Jurisdiction; Consent to Service of Process.</u>  (a)  The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Illinois (including, without limitation, 735 ILCS Section 105/5-1 et seq), but giving effect to federal laws applicable to national banks.

(b)  Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or Illinois State court sitting in Chicago, Illinois in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Illinois State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)  Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10.  <u>WAIVER OF JURY TRIAL.</u>  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11.  <u>Headings.</u>  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12.  <u>Confidentiality.</u>  The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating

to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower, (h) to holders of Equity Interests in a Borrower, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Lender on a non-confidential basis from a source other than the Borrowers.  For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Borrowers or their business, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrowers; provided that, in the case of information received from the Borrowers after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13.  Nonreliance; Violation of Law.  The Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrowers in violation of any Requirement of Law.

SECTION 8.14.   USA PATRIOT Act.   The Lender is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and hereby notifies the Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the names and addresses of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Act.

SECTION 8.15.  Disclosure. Each Loan Party hereby acknowledges and agrees that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16.  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 8.17.  Existing Credit Documents.   Each of the Loan Parties acknowledges and agrees that the Existing Credit Documents remain in full force and effect, subject to the Orders, and each of the Loan Parties shall continue to comply with each of the terms, provisions and conditions thereof.  The Loan Parties hereby agree to continue to make all principal and interest payments on the Term Loan, all interest payments on the Prepetition Revolving Loan, and all payments of fees and reimbursement of expenses with respect to the Existing Letters of Credit, in each case as and when the same are due and payable, subject to the Orders.  In the event that any provision of this Agreement or any other Loan Document conflicts with or is inconsistent with any provision of the Existing Credit Documents, subject to the Orders, the provision that is more burdensome or restrictive as to the Loan Parties shall control.

ARTICLE IX

Loan Guaranty

55

SECTION 9.01.  <u>Guaranty</u>.  Each Loan Guarantor (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Lender the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Lender in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "<u>Guaranteed Obligations</u>").  Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02.  <u>Guaranty of Payment</u>.  This Loan Guaranty is a guaranty of payment and not of collection.  Each Loan Guarantor waives any right to require the Lender to sue the Borrower, any Loan Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "<u>Obligated Party</u>"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03.  <u>No Discharge or Diminishment of Loan Guaranty</u>.  (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including:  (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b)     The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 9.04.  <u>Defenses Waived</u>.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Loan Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations.  Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives

acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person.  Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 9.05.  Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Lender.

SECTION 9.06.  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise, each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Loan Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Lender.

SECTION 9.07.  Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08.  Termination.  The Lender may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until five days after it receives written notice of termination from any Loan Guarantor.  Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of that Guaranteed Obligations.

SECTION 9.09.  Taxes.  Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law.  If any Loan Guarantor determines, in its Permitted Discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10.  Maximum Liability.  The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Loan Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this

Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Guarantors or the Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Loan Guarantor's "Maximum Liability").  This Section with respect to the Maximum Liability of each Loan Guarantor is intended solely to preserve the rights of the Lender to the maximum extent not subject to avoidance under applicable law, and no Loan Guarantor nor any other Person shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Loan Guarantor hereunder shall not be rendered voidable under applicable law. Each Loan Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Loan Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of the Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Loan Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 9.11.  Contribution.  In the event any Loan Guarantor (a "Paying Guarantor") shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty, each other Loan Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article IX, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrowers after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Loan Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Loan Guarantor, the aggregate amount of all monies received by such Loan Guarantors from the Borrowers after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Loan Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Loan Guarantor's Maximum Liability).  Each of the Loan Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of the Lender and the Loan Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

SECTION 9.12.  Liability Cumulative.  The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

ARTICLE X

[Reserved]

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWERS:

**LDR Industries, LLC,**
an Illinois limited liability company

**600 N. Kilbourn, L.L.C.,**
an Illinois limited liability company

By:     **GB Holdings, Inc.,** its sole member

By: _____
Dennis I. Greenspon, a member

By: _____
Dennis I. Greenspon, President

**GB Holdings, Inc.,**
an Illinois corporation

**LDR International, Inc.,**
an Illinois corporation

By: _____
Dennis I. Greenspon, President

By: _____
Lawrence Greenspon, President

LENDER:

**JPMorgan Chase Bank, N.A.,**
a national banking association

By: _____
Lynne Ciaccia, Authorized Officer

*[signature page to Credit Agreement]*

TO BE UPDATED BY BORROWER

## SCHEDULE 3.05

### Properties

Owned:

600 N. Kilbourn Avenue, Chicago, Illinois 60624

Leased:

501 N. Kilbourn (also known as 4445 W. Ferdinand), Chicago, Illinois 60624
Landlord:  RLD Investments, LLC

600 N. Kilbourn Avenue, Chicago, Illinois 60624
Landlord:  600 N. Kilbourn, L.L.C.

PATENTS

| Name of Grantor | Patent Description | Patent Number | Issue Date |
|---|---|---|---|
| LDR Industries | Stem for Bath Accessory (Ashton) | D477168 | 7/15/2003 |
| LDR Industries | Soap Dispenser (P1200) | D544,268 | 6/12/2007 |
| LDR Industries | Soap Dispenser (P1500) | D530,951 | 10/31/2006 |
| LDR Industries | Seat Cover (River design) | D571,903 | 6/24/2008 |
| LDR Industries | Quick Release Toilet Cover Hinge | 8,209,789 B2 | 7/3/2012 |

TRADEMARKS

| Name of Grantor | Trademark | Registration Date | Registration Number |
|---|---|---|---|
| LDR Industries | Nature Mist | 11/9/1993 | 0001803177 |
| LDR Industries | SLK | 9/4/2001 | 0002484964 |
| LDR Industries | LDR (mark and design) | 3/8/1994 | 0001825062 |
| LDR Industries | Exquisite | 7/1/2003 | 000273820 |

TRADENAMES

None.

COPYRIGHTS

None.

INTELLECTUAL PROPERTY LICENSES

None.

TO BE COMPLETED BY BORROWER

**SCHEDULE 3.06**


**Disclosed Matters**

## SCHEDULE 3.12

## Material Agreements

None.

TO BE UPDATED BY BORROWER

**SCHEDULE 3.14**

**Insurance**

| Insurance Coverage | Effective Date | Expiration Date | Insurance Company | Policy Number |
|---|---|---|---|---|
| Commercial Property | 9/1/2012 | 9/1/2013 | Liberty Mutual Fire Co. | U22914503270 |
| General Liability | 9/1/2012 | 9/1/2013 | Federal Insurance Co. | 35846758 |
| Commercial Automobile | 9/1/2012 | 9/1/2013 | Great Northern Ins Co | 73537624 |
| Umbrella-Primary | 9/1/2012 | 9/1/2013 | Federal Insurance Co. | 79849445 |
| Workers Comp | 9/1/2012 | 9/1/2013 | Chubb Insurance Co. | 71713399 |
| Commercial Property | 9/1/2012 | 9/1/2013 | Chubb Insurance Co. | 82106488 |
| Ocean Marine | 9/1/2012 | 9/1/2013 | Fireman's Fund insurance Co. | OC91102900 |

TO BE UPDATED BY BORROWER

## SCHEDULE 3.15

### Capitalization and Subsidiaries

| Subsidiary | Borrower Relationship |
|---|---|
| LDR Industries, LLC | Wholly-owned subsidiary of GB Holdings, Inc. |
| LDR International, Inc. | Wholly-owned subsidiary of LDR Industries, LLC |
| Starlion | Wholly-owned subsidiary of LDR Industries, LLC |
| Beijing Sai Lin Ke Hardware Co. Ltd. | Wholly-owned subsidiary of Starlion |

**(b)**

| Entity | Authorized Equity Interests | Issued Equity Interests |
|---|---|---|
| GB Holdings, Inc. | 10,000 shares of Common Stock, no par value | 100 shares of Common Stock issued to Larry Greenspon as Trustee of the Larry Greenspon Declaration of Trust dated 10-28-91 as amended<br><br>100 shares of Common Stock issued to Dennis I. Greenspon as Trustee of the Dennis I. Greenspon Declaration of Trust dated 3-6-2001 as amended |
| 600 N. Kilbourn, L.L.C. | Not applicable | Two Members (Dennis Greenspon and Larry Greenspon), which each hold 50% of the membership interests |
| LDR Industries, LLC | Not applicable | One Member (GB Holdings, Inc.), which holds 100% of all membership interests |
| LDR International, Inc. | 1,000 shares of Common Stock, no par value | 100 shares of Common Stock issued to LDR Industries |

**(c)**

GB Holdings, Inc. is an Illinois corporation
LDR Industries, LLC is an Illinois limited liability company
LDR International, Inc. is an Illinois corporation
600 N. Kilbourn, L.L.C. is an Illinois limited liability company
Starlion is a Hong Kong entity
Beijing Sae Lin Ke Hardware Co. Ltd is a Chinese entity

TO BE UPDATED BY BORROWER

**SCHEDULE 3.18**

**Affiliate Transactions**

1.  Subordinated Promissory Note, dated June 26, 2013, by LDR Industries, LLC in favor of Larry Greenspon, Trustee Larry Greenspon Trust u/a/d 10-28-94 as amended, in the principal amount of $1,000,000.

2.  Subordinated Promissory Note, dated June 26, 2013, by LDR Industries, LLC in favor of Dennis Greenspon, Trustee Dennis I. Greenspon Declaration of Trust dtd 3-6-01 as amended and restated 9-24-04, in the principal amount of $1,000,000.

3.  Storage Space Leased, dated October 1, 2012, between RLD Investments, LLC and LDR Industries, Inc. (predecessor in interest to LDR Industries, LLC), as amended.

4.  Commercial Lease, dated April 1, 1990, between 600 N. Kilbourn, L.L.C. and LDR Industries, Inc. (predecessor in interest to LDR Industries, LLC), as amended

TO BE UPDATED BY BORROWER

## **SCHEDULE 6.01**

### **Existing Indebtedness**

1. Subordinated Promissory Note, dated June 26, 2013, by LDR Industries, LLC in favor of Larry Greenspon, Trustee Larry Greenspon Trust u/a/d 10-28-94 as amended, in the principal amount of $1,000,000.

2. Subordinated Promissory Note, dated June 26, 2013, by LDR Industries, LLC in favor of Dennis Greenspon, Trustee Dennis I. Greenspon Declaration of Trust dtd 3-6-01 as amended and restated 9-24-04, in the principal amount of $1,000,000.

3. Storage Space Leased, dated October 1, 2012, between RLD Investments, LLC and LDR Industries, Inc. (predecessor in interest to LDR Industries, LLC), as amended.

4. Commercial Lease, dated April 1, 1990, between 600 N. Kilbourn, L.L.C. and LDR Industries, Inc. (predecessor in interest to LDR Industries, LLC), as amended, as amended.

5. Trade payables in the ordinary course of business.

## **SCHEDULE 6.02**

## **Existing Liens**

None.

## SCHEDULE 6.04

## Existing Investments

None.

## SCHEDULE 6.10

## Existing Restrictions

None.

## **EXHIBIT A**

BORROWING BASE CERTIFICATE

## EXHIBIT B

COMPLIANCE CERTIFICATE

LDR INDUSTRIES, LLC
COMPLIANCE CERTIFICATE
[Insert Financial Statement Date]

To:      JPMorgan Chase Bank, N.A.

This Compliance Certificate is furnished pursuant to that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of _____, 2014 (as amended, modified, renewed or extended from time to time, the "Agreement") among LDR Industries, LLC, an Illinois limited liability company, and debtor and debtor-in-possession ("the Borrower"), 600 N. Kilbourn, L.L.C., an Illinois limited liability company ("Kilbourn"), the other Loan Parties thereto and JPMorgan Chase Bank, N.A., as Lender.  Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.      I am the duly elected _____ of the Borrower;

2.      I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of [the Borrower and its] Subsidiaries during the accounting period covered by the attached financial statements and such financial statements present fairly in all material respects the financial condition and results of operations of [the Borrower and its] Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes (with respect to interim financial statements);

3.      The examinations described in paragraph 2 did not disclose, except as set forth below, and I have no knowledge of (i) the existence of any condition or event which constitutes a Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate or (ii) any change in GAAP or in the application thereof that has occurred since the date of the audited financial statements most recently delivered by Borrower to Lender;

4.      I hereby certify that no Loan Party has changed (i) its name, (ii) its chief executive office, (iii) principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization without having given the Lender the notice required by Section 4.15 of the Security Agreement;

5.      Schedule I attached hereto sets forth financial data and computations evidencing the Borrower's compliance with certain financial covenants of the Agreement, all of which data and computations are true, complete and correct; and

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the (i) nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, are taking, or propose to take with respect to each such condition or event or (i) the change in GAAP or the application thereof and the effect of such change on the attached financial statements:

_____

_____

_____

     The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____.

LDR INDUSTRIES, LLC

By:_____

Name:_____

Title:_____

[TO BE UPDATED]

## SCHEDULE I

Compliance as of _____, _____ with
Section 6.12 of the Agreement

Computation of Fixed Charge Coverage Ratio[1]

A. Calculation of EBITDA

    1.  Net Income *plus*        _____

    2.  Interest Expense *plus*     _____

    3.  Income tax expense net of refunds *plus*     _____

    4.  Depreciation and Amortization expense *plus*     _____

    5.  Extraordinary non-cash charges *plus*     _____

    6.  Other non-cash charges[2] *minus*     _____

    7.  Any cash payments made in respect of non-cash     _____
        charges described in line 6 above *minus*

    8.  Any extraordinary gains and non-cash items     _____
        of income

        9.     **EBITDA** (result of lines 1-8)     _____

Compliance = greater than or equal to

Compliance?                       **Yes/No**

B. [Variance to Budget]

---

[1] All line items and calculations subject to terms of Agreement
[2] Any non-cash charge in respect of an item that was included in Net Income in a prior period and any non-cash charge that relates to the write-down or write-off of inventory

## EXHIBIT C

### JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of _____, ____, 200_, is entered into between _____, a _____ (the "New Subsidiary") and JPMORGAN CHASE BANK, N.A. (the "Lender") under that certain Credit Agreement, dated as of June 26, 2013 (as the same may be amended, modified, extended or restated from time to time, the "Credit Agreement") among LDR Industries, LLC, an Illinois limited liability company, and 600 N. Kilbourn, L.L.C., an Illinois limited liability company (collectively, the "Borrowers"), the Loan Parties party thereto, and the Lender.  All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement.

The New Subsidiary and the Lender, hereby agree as follows:

1.     The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Credit Agreement and a "Loan Guarantor" for all purposes of the Credit Agreement and shall have all of the obligations of a Loan Party and a Loan Guarantor thereunder as if it had executed the Credit Agreement.  The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Credit Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article III of the Credit Agreement, *[and]* (b) all of the covenants set forth in Articles V and VI of the Credit Agreement *[and (c) all of the guaranty obligations set forth in Article X of the Credit Agreement.  Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Section 10.10 of the Credit Agreement, hereby guarantees, jointly and severally with the other Loan Guarantors, to the Lender and the Lender, as provided in Article X of the Credit Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Loan Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.]*  *[The New Subsidiary has delivered to the Lender an executed Loan Guaranty.]*

2.     If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as requested by the Lender in accordance with the Credit Agreement.

3.     The address of the New Subsidiary for purposes of Section 8.01 of the Credit Agreement is as follows:

_____

_____

_____

_____

4.        The New Subsidiary hereby waives acceptance by the Lender of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

5.        This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.

6.        THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS.

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Lender, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By:_____

Name:_____

Title:_____


Acknowledged and accepted:

JPMORGAN CHASE BANK, N.A.

By:_____

Name:_____

Title:_____

## **<u>EXHIBIT D</u>**

BUDGET

## **EXHIBIT E**

EXISTING LETTERS OF CREDIT