## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| LDR INDUSTRIES, LLC, | Case No. 14-32138 |
| Debtor. | Honorable Pamela S. Hollis |

**THIRD MODIFIED FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, AND (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER**

On the 25th day of September, 2014, the Court heard the Motion (the "Motion") of LDR Industries, LLC (the "Debtor") seeking entry of an final order (the "Final Order"): (1) authorizing the Debtor to enter into the Senior Secured Super-Priority Debtor in Possession Credit Agreement (the "DIP Agreement"), which will consist of (a) a revolving credit line in the amount of $2.0 million (the "DIP Revolving Facility,") and (b) the Debtor's use of cash collateral (the "Cash Collateral"); (2) granting senior liens and superpriority administrative expense claims; and (3) providing the adequate protection described in the Motion to JPMorgan Chase Bank, N.A. (the "Lender")(such credit facility shall be referred to as the "DIP Facility").

An interim hearing on the Motion having was held by this Court on September 4, 2014 (the "Interim Hearing"); at the Interim Hearing. the Court entered an interim order (the "Interim Order") in respect of the Motion; notice of the entry of the Interim Order and of the Final Hearing on the Motion was thereafter given to all creditors and parties-in-interest as more particularly described below, and no objections were filed to the Motion by the deadline set forth in the Interim Order; having considered the record made before the Court at the Interim Hearing and at the Final Hearing, and further having considered the Motion and all pleadings and

declarations related thereto; and after due deliberation and consideration, and good and sufficient cause appearing, the Court hereby finds and concludes as follows:

A.    On September 2, 2014 (the "Filing Date"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et al. (the "Bankruptcy Code") commencing this case (the "Bankruptcy Case").

B.    The Debtor remains in possession of its assets and is managing its businesses as a debtor-in-possession pursuant to Section 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in this Chapter 11 Case.

C.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief requested herein are Sections 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2.

D.    The Debtor provided notice of the Motion and of the Interim Hearing to the parties and by the means described in the Certificate of Service filed on September 3, 2014 (dkt. #14, pp. 19-23). The Debtor thereafter provided notice of the entry of the Interim Order, notice of the Final Hearing, and a copy of the proposed Final Order to those parties and by the means described in the Certificate of Service filed on September 11, 2014 (dkt. 37), and such notice constitutes due and sufficient notice under the circumstances.

E.    The Debtor is a wholly owned subsidiary of GB Holdings, Inc., an Illinois corporation ("GB Holdings"), whose stock is owned equally by trusts established by Larry

Greenspon and Dennis I. Greenspon (the "Greenspons"). The Debtor owns all of the shares or member interests of LDR International, Inc., an Illinois corporation ("LDR International") and Starlion International Co., Ltd., a Hong Kong company ("Starlion"). In addition, the real estate and improvements on which the Debtor's primary business operations are located are owned by 600 N. Kilbourn, L.L.C., an Illinois limited liability company ("Kilbourn") that is wholly owned by the Greenspons.

F.    The Debtor hereby admits, stipulates and agrees that:

    i.    On June 26, 2013, the Debtor, Kilbourn, and the Lender entered into that certain Credit Agreement (as the same may have thereafter been amended, supplemented, or modified, the "Prepetition Credit Agreement");

    ii.    Pursuant to the Prepetition Credit Agreement, the Lender extended credit to the Debtor on a revolving line of credit basis based on an asset based formula set forth in the Prepetition Credit Agreement (the "Prepetition Revolving Line of Credit");

    iii.    Pursuant to the Prepetition Credit Agreement, the Lender also extended a term loan to Debtor and Kilbourn (the "Prepetition Term Loan") in the original principal amount of $2,800,000;

    iv.    Pursuant to the Prepetition Credit Agreement, the Lender also issued letters of credit for the account of the Debtor (the "Letter of Credit Facility"). As of the Filing Date, a total of three (3) letters of credit totaling $1,540,000 are outstanding (the "Prepetition Letter of Credit Debt");

    v.    As of the Filing Date, (a) the amount due to the Lender on the Prepetition Revolving Line of Credit is $14,816,801.25, consisting of $14,785,410.89 in principal and $31,390.36 in accrued interest and other fees and charges (the "Prepetition Revolver Debt"), (b) the amount due to the Lender on the Term Loan is $2,636,666.62, consisting of $2,636,666.62 in principal and $0 in accrued interest (the "Prepetition Term Debt"); and (c) the face amount of the letters of credit issued and outstanding under the Letter of Credit Facility is $1,540,000. The Prepetition Revolver Debt, the Prepetition Term Debt, and the Prepetition Letter of Credit Debt, together with all costs, expenses, and fees as called for in the Prepetition Credit Agreement, and other prepetition loan documents between the parties (the "Prepetition Loan Documents") shall collectively be referred to as the "Prepetition Indebtedness");

    vi.    The Prepetition Indebtedness constitutes a valid and binding obligation of Debtor and the other non-debtor co-obligors and/or guarantors without

offset, recoupment, counterclaim, deduction, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind;

vii.    To secure repayment of the Prepetition Indebtedness, the Debtor granted to Lender a security interest and lien on all of all its personal property assets, including all now existing or hereafter acquired Accounts, Chattel Paper, Copyrights, Patents and Trademark, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, cash or cash equivalents, letters of credit, Letter-of-Credit Rights and Supporting Obligations, Deposit Accounts with any bank or other financial institution, all Commercial Tort Claims, Assigned Contracts, and all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer material and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing (hereinafter the "<u>Prepetition Personal Property Collateral</u>");[1]

viii.    To further secure the Prepetition Indebtedness, Kilbourn granted to the Lender a mortgage lien on the real estate and improvement located at 600 N. Kilbourn Avenue, Chicago, Illinois (the "<u>Real Estate Collateral</u>") (the Prepetition Personal Property Collateral and the Real Estate Collateral shall sometimes be collectively referred to as the "<u>Prepetition Collateral</u>"); and

ix.    As a result of the foregoing, the Lender holds a valid, perfected, first priority lien and security interest in the Prepetition Collateral to secure repayment of the Prepetition Indebtedness.

G.    The Debtor's use of Cash Collateral alone is insufficient to meet the Debtor's postpetition liquidity needs. The Debtor has an immediate and critical need to obtain post-petition financing under the DIP Facility and to use Cash Collateral in order to finance the ordinary costs of its operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs. The Debtor's access to sufficient working capital and liquidity through the incurrence of post-petition financing pursuant to the DIP Facility under the terms of this Final Order is vital to the

---

[1] The capitalized words and phrases in this subsection shall have the meanings set forth in the Uniform Commercial Code as adopted in the State of Illinois.

preservation and maintenance of the going concern value of the Debtor's estate. Consequently, without access to the DIP Facility, to the extent authorized pursuant to this Final Order, the Debtor would suffer immediate and irreparable harm.

H.      The Debtor is unable to obtain adequate unsecured credit under Section 503(b) of the Bankruptcy Code, or secured credit under Section 364 of the Bankruptcy Code from sources other than the Lender on terms more favorable than the terms of the DIP Facility. The only feasible source of secured credit available to the Debtor is the DIP Facility. The Debtor requires financing under the DIP Facility under the terms of this Final Order in order to satisfy its immediate critical post-petition liquidity needs.

I.       The Lender has indicated a willingness to provide the Debtor with certain financing commitments, but solely on the terms and conditions set forth in this Final Order and in the DIP Credit Agreement and all other documents and instruments executed pursuant thereto (collectively, the "DIP Facility Documents"). After considering all of its alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the financing to be provided by the Lender, pursuant to the terms of this Final Order and the DIP Facility Documents represents the best financing presently available to the Debtor under the facts and circumstances of this case.

J.       Good cause has been shown for entry of this Final Order. In particular, the authorization granted herein for the Debtor to execute the DIP Facility Documents, to continuing using Cash Collateral, and to obtain financing, is necessary to avoid immediate and irreparable harm to the Debtor and its estate. Entry of this Final Order is in the best interest of the Debtor, its estate and creditors. The terms of the DIP Facility Documents are fair and reasonable under

the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

K.    The Debtor and the Lender have negotiated the terms and conditions of the DIP Facility Documents, the Interim Order, and this Final Order in good faith and at arm's-length, and any credit extended and loans made to the Debtor pursuant to the Interim Order or the Final Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code.

L.    Based on the foregoing, and upon the record made before this Court, and good and sufficient cause appearing therefore,

**IT IS HERFBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Motion Granted</u>.  The Motion is GRANTED, subject to the terms and conditions set forth in this Final Order.  The Debtor shall be, and hereby is, authorized, directed and empowered to execute and deliver the DIP Facility Documents and to perform its obligations thereunder in accordance with the terms of the DIP Facility Documents.[2]  The DIP Facility Documents shall be, and they hereby are, approved by this Final Order and, by this reference, incorporated herein as part of this Final Order.

2.    <u>Borrowing Authorized; Budget</u>.  The Debtor is hereby authorized to borrow money under the DIP Facility Documents during the term of the DIP Facility Documents in an amount not to exceed $2,000,000 to fund its business operations in accordance with the budget (the "<u>Budget</u>") that is attached hereto as Exhibit A and incorporated herein by this reference.  In addition, the Debtor is further authorized to use Cash Collateral in accordance with and for the purposes set forth in the Budget and pursuant to the terms of the DIP Facility Documents and

---

[2] Specifically, the Debtor is authorized and directed to enter into any amendments to the DIP Facility Documents that are needed to conform the terms of such DIP Facility Documents to the terms of this Final Order.

this Final Order. The Debtor and Lender have agreed that substantially all cash of the Debtor

now in existence or hereafter acquired constitutes the Cash Collateral of the Lender within the

meaning of Bankruptcy Code § 363(a).

      3.    <u>DIP Obligations</u>. The Debtor is further authorized, directed and obligated to

comply with and perform all of the terms and conditions contained in the DIP Facility

Documents, and the Debtor is authorized and obligated to repay amounts owing, with interest

and any other charges, to the Lender in accordance with and subject to the terms and conditions

set forth in the DIP Facility Documents and this Final Order. All advances made under the DIP

Credit Facility Agreement (including any protective advances) and interest thereon, and all fees,

costs, expenses, indebtedness, obligations and liabilities of the Debtor to the Lender under or in

respect of the DIP Facility Documents and this Final Order are referred to herein as the "<u>DIP</u>

<u>Obligations</u>."

      4.    <u>DIP Liens; Superpriority Claims</u>. In accordance with Bankruptcy Code

§§ 364(c)(1), (c)(2), (c)(3) and (d)(1) and 507(b), to secure repayment of the DIP Obligations:

      a.    <u>DIP Liens</u>. The Lender shall have a fully perfected first priority, valid, binding,
enforceable, non-avoidable and automatically perfected, security interests in and
liens (the "<u>DIP Liens</u>") on all Accounts, Chattel Paper, Copyrights, Patents and
Trademark, Documents, Equipment, Fixtures, General Intangibles, Goods,
Instruments, Inventory, Investment Property, cash or cash equivalents, letters of
credit, Letter-of-Credit Rights and Supporting Obligations, Deposit Accounts with
any bank or other financial institution, all Commercial Tort Claims, Assigned
Contracts, and all accessions to, substitutions for and replacements, proceeds
(including Stock Rights), insurance proceeds and products of the foregoing,
together with all books and records, customer lists, credit files, computer files,
programs, printouts and other computer material and records related thereto and
any General Intangibles at any time evidencing or relating to any of the foregoing,
whether now existing or hereafter acquired (the "<u>DIP Collateral</u>"). The DIP Liens
shall constitute first priority security interests in and lien on all DIP Collateral
subject in priority only to valid perfected, enforceable and non-avoidable liens in
existences as of the Filing Date held by parties other than the Lender. The Lender
shall retain its prepetition lien on all Prepetition Collateral to secure the
Prepetition Indebtedness, but as part of the DIP Facility, the Lender consents to

being primed by the DIP Liens on account of its prepetition liens on the
Prepetition Collateral;

    b.    <u>Superpriority Claim</u>. Pursuant to section 364 (c) of the Bankruptcy Code, all DIP
Obligations will constitute an allowed superpriority administrative expense claim
in the Bankruptcy Case having priority over all administrative expenses or other
claims of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code
("<u>Lender's Superpriority Claim</u>");

    c.    <u>Carve-Out and Other Limitations</u>. The DIP Liens, the Lender's Superpriority
Claim. and the Adequate Protection Liens (as hereafter defined) shall at all times
be subject to the Carve-Out (as defined below), but the Lender shall not in any
event receive a lien on any claims or recoveries by or on behalf of the Debtor or
its estate arising out of Chapter 5 of the Bankruptcy Code.

    5.    <u>Adequate Protection</u>. As adequate protection for its interest in the Prepetition
Collateral (including Cash Collateral) and to secure the Prepetition Indebtedness, the Lender
shall receive pursuant to sections 361, 363, and 364 of the Bankruptcy Code, replacement
security interests in and liens upon all of the DIP Collateral to the same extent, validity and
perfection of the Lender's security interests in the Prepetition Collateral (the "<u>Adequate
Protection Replacement Liens</u>").

    6.    <u>Automatic Perfection</u>. The DIP Liens and the Adequate Protection Replacement
Liens granted in favor of Lender in all of the DIP Collateral shall be perfected without the
recordation of any UCC financing statements . Notwithstanding the foregoing, Debtor is
authorized to execute such financing statements, instruments and notices as may be requested by
Lender.

    7.    <u>Carve-Out</u>. The DIP Liens, the Adequate Protection Replacement Liens, and the
Lender's Superpriority Administrative Expense Claims granted in favor of Lender in connection
with the DIP Facility shall be subject to a carveout (the "Carveout") for: (i) the payment of all
U.S. Trustee fees that become due during the Bankruptcy Case, and (ii) the payment of all
allowed fees and expenses  payable to professionals retained pursuant to Section 327 of the

Bankruptcy Code by the Debtor or any official unsecured creditors committee ("Committee") that may hereafter be formed (collectively the "Allowed Professional Fees"); provided, however that (a) the Allowed Professional Fees included in the Carveout shall not exceed $100,000 in fees incurred after occurrence of an Event of Default under the DIP Facility and written notice by Lender to Debtor and its counsel in accordance with Section 8.01 of the DIP Credit Agreement, and (b) the aggregate amount of Allowed Professional Fees included in the Carveout (including those incurred both pre- and post-Event of Default) shall not exceed $750,000 during the term of the Bankruptcy Case.  In any event, the Carveout shall not include any Allowed Professional Fees whatsoever that are incurred in prosecuting a Challenge Action (as hereafter defined) against the Lender or in hindering, delaying or otherwise attempting to prevent enforcement of its liens or realization upon its Prepetition Collateral or its DIP Collateral.

8.   Challenge Period.  In one or more previous orders of this Court, all creditors and other parties in interest were given until December 9, 2014 to commence an action challenging the validity, extent, and priority of the Lender's prepetition claims and liens against the Debtor ("Challenge Action").  Since no Challenge Action was commenced by December 9, 2014, all of the Findings set forth in paragraph F above are now are binding upon all other parties in interest, including any Committee.

9.   Interest.  Interest shall accrue and be payable on the amounts outstanding under the DIP Facility  before default at the CB Floating Rate plus 100 basis points (all capitalized terms shall have the same meaning as set forth in the Prepetition Credit Agreement).  After default, the applicable interest rates shall all increase by 200 basis points.  As further adequate protection, the Lender shall receive regularly scheduled payments of interest on the Prepetition

Revolver Debt, and regularly scheduled payments of principal and interest on the Prepetition Term Debt.

10.   Facility Fee; Non-Utilization Fee; Letter of Credit Fees.  A DIP Facility fee equal to $25,000 shall be due and payable to Lender upon entry of this Final Order.  In addition, the Lender shall be entitled to and shall receive an unused DIP facility fee equal to .25% per annum, payable monthly.  The Debtor will continue to pay to Lender when due all fees due and to become due on the Letter of Credit Facility.

11.   Reporting Requirements.  In addition to all reports required in the Prepetition Credit Documents, on the second business day of each week, the Debtor shall provide a written updated Budget on a weekly, rolling basis and shall deliver a written variance analysis with respect to the Debtor's actual revenue, collections and expenses during the prior week measured on a line item basis against the Budget and indicate whether it is in compliance with the Budget and the terms of the DIP Facility, in each case in form and substance satisfactory to Lender.  In connection with delivery of the weekly updated Budget, the Debtor shall clearly identify to Lender any changes made from the prior Budget and shall include an updated inventory report and in-transit inventory report, each in form and substance satisfactory to Lender.

12.   Permitted Budget Variances.  Debtor's actual sales shall be no less than 90% of the projected amounts set forth in the Budget on a cumulative basis.  Debtor's cumulative "Net CF" (as defined on page 2 of the Budget) as of the last day of any week shall not be more than $500,000 below projected amounts set forth in the Budget on a cumulative basis for that portion of the Budget period then ended.  Debtor's EBITDA, measured on a monthly basis, shall not be less than 85% of Debtor's EBITDA set forth in the Budget, tested on a cumulative basis (any

budget variances that are greater than as described immediately above shall be referred to as

"Non-Permitted Budget Variances").

13.     Events of Default.  Debtor's authorization to use Lender's Cash Collateral and to

obtain advances under the DIP Facility shall immediately and automatically terminate (except as

Lender may otherwise agree in writing in its sole discretion and subject to any applicable notice

requirements as set forth *infra*) on the earliest to occur of (each such occurrence being

hereinafter referred to as a "Termination Event"): (i) December 31, 2014 (the "Expiration

Date"); (ii) the dismissal of the Case or the conversion of the Case to a case under Chapter 7 of

the Bankruptcy Code; (iii) appointment in the Case of a trustee under section 1104 of the

Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section

1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code; (iv)

entry of an order amending, supplementing, staying, vacating, revoking, reversing or otherwise

modifying the DIP Facility or this Final Order without the prior written consent of Lender; (v)

entry of an order permitting any claims against, or obligation of, the Debtor (now existing or

hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the

priority of Lender in respect of either the Prepetition Indebtedness or the DIP Obligations; (vi)

the occurrence of a default under the DIP Credit Facility Documents or this Final Order;  (vii)

the occurrence of any Non-Permitted Budget Variance, and (viii) the failure to satisfy any Sale

Benchmarks.

14.     Remedies Upon Event of Default.  Upon occurrence of a Termination Event, and

after providing three (3) days' notice in writing, via facsimile or email to the Debtor and its

counsel, the Debtor shall cease using Cash Collateral on the third business day after the date on

which Debtors receive notice of such Termination Event (the date of such cessation being

referred to as a "Termination Date"). Notwithstanding the first sentence of this Paragraph,

Lender may, in its sole discretion, consent to extend the Expiration Date or the Termination Date

without further order of the Court whereupon all of the terms, conditions, protections and other

provisions of this Final Order shall remain in full force and effect.

15. Sale Benchmarks. The Debtor intends to solicit offers to purchase substantially

all of its assets (and certain non-debtor's assets but not including the Real Estate) calling for the

payment of a cash  purchase price that is at least sufficient to pay in full all of the Prepetition

Indebtedness and the DIP Facility, together with all other fees and expenses due to Lender, with

a closing to occur no later than February 27, 2015 with such sale of assets to be free and clear of

all liens, claims or interests, including any asserted by US Customs (such sale shall be a

"Qualifying Sale"). The Debtor shall (a) by no later than January 20, 2015, file a motion with

the Bankruptcy Court to approve a Qualifying Sale, (b) by no later than January 20, 2015, enter

into an asset purchase agreement with the prospective purchaser for a Qualifying Sale; (c) by no

later than February 3, 2015, receive Bankruptcy Court approval of the Bid Procedures and

provide notice of bid procedures to all potential bidders; (d) by no later than February 3, 2015,

receive a non-binding term sheet from the lender for the prospective purchaser; and (e) by no

later than February 17, 2015, receive an executed and binding financing commitment from the

lender for the prospective purchaser; (each a "Sale Benchmark" and collectively the "Sale

Benchmarks"). The Debtor is authorized to enter into any written amendment to the DIP facility

with Lender to extend the Sale Benchmarks without further Court order, but with notice to the

Court through filing such a notice through the Court's CM/ECF system.

16.    No Effect on Non-Debtors.  Except as specifically provided herein, no provision of this Final Order shall be deemed a waiver, release, or alteration by Lender of its rights with respect to any non-debtor obligors under the Prepetition Loan Agreements.

17.    Modifications; Resolution of Conflicts.  If any or all of the provisions of this Final Order are hereafter modified, vacated or stayed by subsequent order of this Court or any other Court, without Lender's consent, such stay, modification or vacation shall not affect (i) the validity of any obligation, indebtedness or liability incurred by Debtor to Lender that is or was incurred pursuant to this Final Order before Lender's receipt of notice of the effective date of such stay, modification or vacation, or (ii) the validity and enforceability of the liens and security interests authorized, retained, granted or created by Interim Order.  In the event that any of the provisions of the DIP Credit Facility Documents or the Interim Order contradict with the express terms of this Final Order, this Final Order shall control.

18.    Nunc Pro Tunc.  Except as expressly stated to the contrary in this Final Order, this Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Filing Date immediately upon entry hereof.

19.    No Stay.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), this Final Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon issuance hereof.

JAN 29 2015

Dated: January __, 2015

IT IS SO ORDERED:

_____
Hon. Pamela S. Hollis
United States Bankruptcy Judge

**Exhibit A**

**Budget**

**LDR INDUSTRIES, LLC**
**WEEKLY CASH FLOW**
**JANUARY 9, 2015 - FEBRUARY 27, 2015**

| Week Ending Date / Actual/Forecast | 01/09/15 Forecast | 01/16/15 Forecast | 01/23/15 Forecast | 01/30/15 Forecast | 02/06/15 Forecast | 02/13/15 Forecast | 02/20/15 Forecast | 02/27/15 Forecast | Forecast Total 1/9/15 - 2/27/15 |
|---|---|---|---|---|---|---|---|---|---|
| NET SALES | 938,121 | 1,289,472 | 1,504,384 | 1,520,623 | 1,343,200 | 1,289,472 | 1,504,384 | 1,235,744 | 10,749,600 |
| NET RECEIPTS | 1,120,439 | 752,489 | 951,492 | 2,200,366 | 720,269 | 722,486 | 2,272,038 | 1,244,093 | 9,388,654 |
| **DISBURSEMENTS** | | | | | | | | | |
| **Inventory Costs** | | | | | | | | | |
| Purchases | 888,909 | 882,588 | 827,500 | 529,737 | 538,867 | 709,323 | 664,235 | 779,779 | 5,810,938 |
| Brokerage Fees | 67,238 | 43,235 | 50,441 | 19,233 | 45,037 | 43,235 | 50,441 | 41,434 | 360,296 |
| Freight in | 148,178 | 132,704 | 56,178 | 29,555 | 76,944 | 73,866 | 86,178 | 70,789 | 674,292 |
| Total Inventory Costs | 1,104,326 | 1,058,528 | 934,119 | 578,525 | 660,848 | 826,425 | 790,854 | 892,001 | 6,845,625 |
| **Payroll Expenses** | | | | | | | | | |
| Payroll - Sales | 50,191 | | 52,630 | | 52,630 | | 52,630 | | 208,082 |
| Payroll - Delivery | 39,738 | | 38,776 | | 38,776 | | 38,776 | | 156,067 |
| Payroll - Purchasing | 18,218 | | 18,258 | | 18,258 | | 18,258 | | 72,993 |
| Payroll - Warehouse | 13,943 | | 14,176 | | 14,176 | | 14,176 | | 56,471 |
| Payroll - EDP | 12,637 | | 12,685 | | 12,685 | | 12,685 | | 50,691 |
| Payroll - Admin | 12,211 | | 60,327 | | 60,227 | | 60,227 | | 235,891 |
| Payroll Taxes | 13,713 | | 13,038 | | 13,038 | | 13,038 | | 52,828 |
| Employee Benefits | (1,325) | | | | 151,000 | 75,196 | | | 234,871 |
| Total Payroll & Benefits | 202,326 | - | 209,991 | | 370,991 | 75,196 | 209,991 | - | 1,068,494 |
| **Sales Expenses** | | | | | | | | | |
| Commissions | | 60,670 | | | | 61,158 | | | 121,628 |
| Other | 3,271 | 24,227 | 24,227 | 24,227 | 24,227 | 24,227 | 24,227 | 24,227 | 172,860 |
| Total Sales Expenses | 3,271 | 84,897 | 24,227 | 24,227 | 24,227 | 85,385 | 24,227 | 24,227 | 294,488 |
| **Delivery Expenses** | | | | | | | | | |
| Outbound Freight | 21,679 | 67,626 | 78,897 | 85,004 | 70,444 | 67,626 | 78,897 | 64,808 | 534,980 |
| Total Delivery Expenses | 21,679 | 67,626 | 78,897 | 85,004 | 70,444 | 67,626 | 78,897 | 64,808 | 534,980 |
| **Purchasing Expenses** | | | | | | | | | |
| Other | 10 | 2,302 | 2,302 | 2,302 | 2,302 | 2,302 | 2,302 | 2,302 | 16,125 |
| Total Purchasing Expenses | 10 | 2,302 | 2,302 | 2,302 | 2,302 | 2,302 | 2,302 | 2,302 | 16,125 |
| **Occupancy Expenses** | | | | | | | | | |
| Rent | | 70,000 | | | | 70,000 | | | 140,000 |
| Utilities | | 8,394 | 8,394 | | | 8,394 | 8,394 | | 33,575 |
| Other | | 511 | 511 | 511 | 511 | 511 | 511 | 62,344 | 65,408 |
| Total Occupancy Expenses | - | 78,904 | 8,904 | 511 | 511 | 78,904 | 8,904 | 62,344 | 238,983 |
| **Warehouse Expenses** | | | | | | | | | |
| Supplies | 11,537 | 7,333 | 7,333 | 7,333 | 7,333 | 7,333 | 7,333 | 7,333 | 72,870 |
| Rent | | | | | 4,167 | | | | 4,167 |
| Outside Labor | | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 61,250 |
| Other | | 2,657 | 2,657 | 2,657 | 2,657 | 2,657 | 2,657 | | 18,601 |
| Total Warehouse Expenses | 21,537 | 18,741 | 18,741 | 18,741 | 22,908 | 18,741 | 18,741 | 18,741 | 156,888 |
| **EDP Expenses** | | | | | | | | | |
| Other | | 2,090 | 2,090 | 2,090 | 2,090 | 2,090 | 2,090 | 2,090 | 14,628 |
| Total EDP Expenses | - | 2,090 | 2,090 | 2,090 | 2,090 | 2,090 | 2,090 | 2,090 | 14,628 |
| **General & Administrative Expenses** | | | | | | | | | |
| Legal Services | | | | 200,000 | | | 250,000 | | 450,000 |
| Professional Services | | | | | 150,000 | | 100,000 | | 250,000 |
| Other | 5,379 | 16,594 | 16,594 | 16,594 | 16,594 | 16,594 | 16,594 | 16,594 | 121,539 |
| Total General & Administrative | 5,379 | 16,594 | 16,594 | 216,594 | 166,594 | 16,594 | 366,594 | 16,594 | 821,539 |
| **Interest Expense** | | | | | | | | | |
| Interest Expense | | | | | 43,671 | | | | 43,671 |
| Total Interest | - | - | - | - | 43,671 | - | - | - | 43,671 |
| **Intercompany** | | | | | | | | | |
| Intercompany Transfers | | | 60,000 | | | | 60,000 | | 120,000 |
| Total Intercompany | - | - | 60,000 | - | - | - | 60,000 | - | 120,000 |
| **Other Misc Balance Sheet Items** | | | | | | | | | |
| Other Misc Balance Sheet Items | 3,203 | | | | | | | | 3,203 |
| Other Misc Balance Sheet Items | 3,203 | | | | | | | | 3,203 |
| **TOTAL DISBURSEMENTS** | 1,361,730 | 1,329,682 | 1,355,865 | 927,992 | 1,364,585 | 1,173,263 | 1,562,600 | 1,083,107 | 10,158,823 |
| NET CF (Weekly) | (241,309) | (577,193) | (404,373) | 1,277,393 | (644,316) | (450,805) | 709,438 | 160,986 | (170,169) |
| NET CF (Cumulative) Beginning 9/5/14 | (13,493) | (510,686) | (1,015,059) | 262,335 | (381,981) | (832,786) | (123,348) | 37,638 | |
| Beginning Cash | 618,723 | 377,423 | (199,770) | (604,143) | 673,250 | 28,935 | (421,870) | 287,566 | 618,723 |
| Change in Cash | (241,300) | (577,193) | (404,373) | 1,277,393 | (644,316) | (450,805) | 709,438 | 160,986 | (170,169) |
| Unapplied Cash/Misc Adj | | | | | | | | | |
| Ending Cash | 377,423 | (199,770) | (604,143) | 673,250 | 28,935 | (421,870) | 287,566 | 448,554 | 448,554 |

**LDR INDUSTRIES, LLC**
**WEEKLY CASH FLOW**
**JANUARY 9, 2015 - FEBRUARY 27, 2015**

| Week Ending Date | 01/09/15 | 01/16/15 | 01/23/15 | 01/30/15 | 02/06/15 | 02/13/15 | 02/20/15 | 02/27/15 | Forecast Total |
|---|---|---|---|---|---|---|---|---|---|
| Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 1/9/15 - 2/27/15 |
| **BORROWING BASE CALCULATION** | | | | | | | | | |
| Accounts Receivable | | | | | | | | | |
| Beg. Balance | 11,600,359 | 10,816,851 | 11,297,124 | 11,384,549 | 10,748,414 | 11,312,446 | 11,822,750 | 10,989,629 | |
| Add: Sales | 958,121 | 1,289,472 | 1,504,384 | 1,620,923 | 1,343,200 | 1,289,472 | 1,504,384 | 1,235,744 | |
| Unapplied cash adjustments | 49,649 | | | | | | | | |
| Misc other adjustments | | | | | | | | | |
| Less: Collections | | | | | | | | | |
| A/R Ending Balance | 10,817,851 | 11,297,124 | 11,384,549 | 10,748,414 | 11,312,446 | 11,822,750 | 10,989,629 | 10,926,760 | |
| Less: Ineligibles | | | | | | | | | |
| Eligible A/R | 8,502,606 | 8,962,879 | 9,070,304 | 8,434,169 | 8,996,201 | 10,608,505 | 9,775,384 | 9,712,515 | |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | |
| A/R Availability | 7,227,215 | 7,635,447 | 7,709,759 | 7,169,043 | 7,646,471 | 9,017,229 | 8,309,077 | 8,255,638 | |
| NOLV Inventory | | | | | | | | | |
| Inventory Balance | 17,930,425 | 18,131,454 | 18,132,111 | 17,872,788 | 17,640,408 | 17,609,334 | 17,395,773 | 17,470,004 | |
| Less: Ineligibles | | | | | | | | | |
| Eligible Inventory Balance | 17,502,021 | 17,703,060 | 17,743,707 | 17,444,384 | 17,212,004 | 17,180,930 | 16,971,369 | 17,041,600 | |
| Advance Rate | 51.68% | 51.68% | 51.68% | 51.68% | 51.68% | 51.68% | 51.68% | 51.68% | |
| NOLV Inventory Availability | 9,045,044 | 9,148,936 | 9,169,948 | 9,015,258 | 8,895,164 | 8,879,105 | 8,770,803 | 8,807,069 | |
| Inventory Limit | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | |
| Inventory Availability | 9,045,044 | 9,148,936 | 9,169,948 | 9,015,258 | 8,895,164 | 8,879,105 | 8,770,803 | 8,807,069 | |
| | | | | | | | | | |
| AR and Inventory Availability | 16,272,260 | 16,784,383 | 16,879,706 | 16,184,301 | 16,543,634 | 17,896,324 | 17,079,880 | 17,062,737 | |
| Available SOFA | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | |
| Available Cash a/c 8217 Funding | 257,366 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | |
| Less: Dilution Reserve | | | | | | | | | |
| Availability net of Dilution | 17,000,363 | 17,865,120 | 17,950,443 | 17,255,036 | 17,614,371 | 18,967,071 | 18,150,617 | 18,133,474 | |
| Less: Letters of Credit | (1,400,000) | (1,400,000) | (1,400,000) | (1,400,000) | (1,400,000) | (1,400,000) | (1,400,000) | (1,400,000) | |
| Loan Balance Prior to Filing | (14,816,801) | (14,816,801) | (14,816,801) | (14,816,801) | (14,816,801) | (14,816,801) | (14,816,801) | (14,816,801) | |
| Total Availability Including SOFA | 783,562 | 1,636,319 | 1,733,642 | 1,038,237 | 1,397,570 | 2,750,276 | 1,933,816 | 1,916,673 | |
| DIP Loan Limit | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | |
| Max Borrowing Limit | 783,562 | 1,636,319 | 1,733,642 | 1,038,237 | 1,397,570 | 2,000,000 | 1,933,816 | 1,916,673 | |
| DIP Loan Balance | 0 | (339,770) | (604,143) | 0 | 0 | (421,870) | 0 | 0 | |
| Availability Not Borrowed | 783,562 | 1,298,549 | 1,129,499 | 1,038,237 | 1,397,570 | 1,578,130 | 1,933,816 | 1,916,673 | |